Rex BLACK, Plaintiff,

v.

John SNOW, Secretary of the Treasury Defendant.

No. CIV.A.00–3039 (ESH).

United States District Court, District of Columbia.

July 23, 2003.

Richard Ernest Gardiner, Fairfax, VA, for plaintiff.

Rhonda Chaudelle Fields, Gordon Michael Harvey, U.S. Attorney's Office, Civ. Div., Washington, DC, for defendant.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Federal law bars convicted felons · from possessing firearms. The Attorney General may grant relief from this prohibition if it is established to his satisfaction that certain conditions have been met. *See* 18 U.S.C. § 925(c); *United States v. Bean,* 537 U.S. 71, 123 S.Ct. 584, 586, 154 L.Ed.2d 483 (2002).[1] By regulation, the

---

**1.** Before November 2002, the power to review and act upon applications under § 925(c) belonged to the Secretary of the Treasury. That power was transferred to the Attorney General by the Homeland Security Act of 2002, · Pub.L. No. 107–296, § 1112(f)(6), 116 Stat. 2135 (Nov. 25, 2002).

power to restore firearms rights has been delegated to the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). However, every year since 1992 Congress has included language in the ATF's annual appropriation that forbids the Bureau from expending any of its funds in connection with applications made by individuals under § 925(c).

Plaintiff Rex Black, a convicted felon, has brought this suit in an effort to force the Attorney General to act upon his § 925(c) application. To this end, he both seeks a writ of mandamus and makes a claim under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(1), to "compel administrative action unlawfully withheld or unreasonably delayed." Plaintiff argues that the funding restriction imposed on ATF does not bar the Attorney General himself from granting applications made under § 925(c). In the alternative, he claims that insofar as the appropriations ban *does* effectively foreclose individualized relief from federal firearms disabilities, such a prohibition would itself violate the Due Process Clause, as federal law would then contain an irrebuttable presumption that every person convicted of a felony is too dangerous to be trusted with guns. The Court is not persuaded by these arguments and therefore will grant defendant's motion for summary judgment.

## BACKGROUND

The Gun Control Act of 1968 makes it unlawful for any person convicted of a crime punishable by imprisonment for more than one year to "ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). However, such persons are permitted to apply to the Secretary of the Treasury "for relief from the disabilities imposed by Federal laws with respect to the acquisition, receipt, transfer, shipment, transportation, or possession of firearms, and the Secretary may grant such relief if it is established to his satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c). In 1972, the Secretary delegated this authority to ATF, where it has remained ever since.

At the time of this original delegation, ATF was part of the Treasury Department. Effective January 24, 2003, however, the Homeland Security Act moved the Bureau (rechristened as the "Bureau of Alcohol, Tobacco, Firearms, and Explosives") to the Department of Justice, and transferred the Secretary of the Treasury's power to act upon § 925(c) applications to the Attorney General. *See* Pub.L. No. 107–296, title XI, 116 Stat. 2135 (Nov. 25, 2002). Soon thereafter, the Attorney General delegated that authority back to ATF. *See* 28 C.F.R. § 0.130(a)(1); 68 Fed. Reg. 4923, 4926 (Jan. 31, 2003); *cf.* 28 U.S.C. § 510 (allowing the Attorney General to "make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General"). The parties agree that this governmental reorganization has no effect on the merits of plaintiff's suit, although it does require that the Attorney General be substituted for the Secretary of the Treasury as the sole defendant. *See* FED. R. CIV. P. 25(c).[2]

---

2. To avoid confusion, the Court will follow the parties' lead and refer to defendant as the "Secretary/Attorney General."

More relevant is Congress' decision, first made in 1992 and continued each year thereafter, to prohibit the federal funds appropriated annually for ATF from being used "to investigate or act upon applications for relief from Federal firearm disabilities under 18 U.S.C. § 925(c)." Treasury, Postal Service and General Government Appropriations Act, Pub.L. No. 102–393, 106 Stat. 1729, 1732 (Oct. 6, 1992). To the present day, every ensuing ATF appropriation has contained the same restriction on the processing of individual applications (although since 1994 Congress has allowed ATF to use its appropriated funds to act upon § 925(c) applications made by corporations). *See Bean,* 123 S.Ct. at 587 n. 3 (cataloging these appropriations provisions).[3] Bound by this prohibition, ATF now simply returns any individual application that it receives with an explanation that it is permitted to do no more.[4]

In 1986, plaintiff was convicted in California of possessing narcotics for sale, which under the law of that state is punishable by more than one year's imprisonment. On August 26, 2000, plaintiff (now a resident of Texas) submitted to the Secretary of the Treasury an application under § 925(c) for restoration of his right to possess firearms. Acting on the Secretary's behalf, ATF invoked the appropriations restrictions and informed plaintiff on December 15, 2000, that his application could not be processed. On December 21, plaintiff filed the present action against the Secretary/Attorney General. In his complaint, plaintiff asks for two different forms of relief. First, invoking both the writ of mandamus and the APA, he seeks to compel the Secretary/Attorney General (rather than ATF) to act on his application. Second, in the event that it is determined that the appropriations restrictions operate as a *de facto* repeal of § 925(c), plaintiff seeks a declaration that Congress' decision to leave convicted felons without a mechanism under federal law for the restoration of their right to bear arms violates the Due Process Clause of the Fifth Amendment.

This case was temporarily put on hold after the Fifth Circuit held that a district court could itself order individual relief under § 925(c), even in the absence of action by ATF. *See Bean v. ATF,* 253 F.3d 234 (5th Cir.2001). Hoping to take advantage of that decision, plaintiff sought to dismiss this action in order to pursue a *Bean*-type claim in Texas. However, on December 10, 2002, the Supreme Court reversed the Fifth Circuit, concluding that ATF's inaction was not a "denial" of the application within the meaning of § 925(c), and therefore that no judicial review was available under that provision. *See* 123 S.Ct. at 587–88. At the same time, however, the Supreme Court noted that Bean had not asserted an APA claim against the Secretary of the Treasury for action un-

---

**3.** Like its predecessors, the most recent incarnation of this appropriations restriction authorizes a sum of money for ATF's "necessary expenses" followed by a proviso: "That none of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. 925(c)." Consolidated Appropriations Resolution, Pub.L. No. 108–7, 117 Stat. 11 (Feb. 20, 2003).

**4.** It should be noted, however, that ATF's mandated inaction does not necessarily mean

that a convicted felon is forever barred from possessing firearms. Under 18 U.S.C. § 921(a)(20), any conviction "which has been expunged, or set aside, or for which a person has been pardoned or has had civil rights restored" is not considered a conviction for purposes of the federal Gun Control Act. Thus, an individual who seeks and obtains a pardon or expungement of his underlying criminal conviction may once again possess a firearm without fear of federal criminal liability under § 922(g).

lawfully withheld or unreasonably delayed. *See id.* at 586 n. 2. In light of the Supreme Court's decision, plaintiff reopened his suit before this Court, in which he pursues the claim that Bean did not. Both parties have now filed cross-motions for summary judgment, to which the Court now turns.

## ANALYSIS

### I. *Plaintiff's APA Claim*

The APA authorizes federal courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Here, plaintiff asserts that the Secretary/Attorney General's failure to take action on his § 925(c) application warrants this remedy. The Court cannot agree. To begin, there can be little doubt that plaintiff's APA claim would fail had it been brought against ATF itself. The appropriations restriction manifestly forbids ATF from expending any money to engage in the action that plaintiff seeks to compel. As the Second Circuit has written:

> Congress could not have stated more clearly that the ATF is prohibited from acting on applications submitted by individuals pursuant to § 925(c). The parties have not suggested that the ATF has access to any funds other than those affected by the relevant spending limitation, nor are we aware of any such funds. Thus, while the annual appropriations statutes speak in terms of the ATF's ability to spend appropriated funds, their affect on the agency is obvious: It may neither grant nor deny applications falling within the scope of the funding restriction.

*McHugh v. Rubin,* 220 F.3d 53, 58 (2d Cir.2000). Far from unlawfully withholding action, therefore, ATF was under a legal duty *not* to act. Under those circumstances, a § 706(1) claim against the Bureau based on its failure to respond to a § 925(c) application would be essentially frivolous. *See Mullis v. United States,* 230 F.3d 215, 219 (6th Cir.2000) ("Given Congress' explicit instructions that the ATF should not spend any appropriated funds to process applications for the removal [of] firearm disabilities, plaintiff could hardly argue that the ATF has acted unlawfully or unreasonably in failing to process his application.").

■ Accordingly, the question in this case becomes whether that result should be different merely because plaintiff has sued the Secretary/Attorney General rather than ATF. No court has directly confronted this issue, although the Supreme Court in *Bean* expressed significant doubt about the viability of such a claim:

> First, it appears that the Secretary delegated to ATF the exclusive authority to act on petitions brought under § 925(c); such delegation is not unreasonable. Second, even assuming the Secretary has retained the authority to act on such petitions, it is not clear that respondent would prevail were he to file a requisite action under 5 U.S.C. § 706(1) (providing for judicial review to "compel agency action unlawfully withheld or unreasonably delayed"). Not only does the Secretary, by the explicit terms of the statute, possess broad discretion as to whether to grant relief, but congressional withholding of funds from ATF would likely inform his exercise of discretion.

123 S.Ct. at 586 n. 2 (internal citations omitted). Picking up on these clues, the Court can easily reject plaintiff's APA claim. First, as to delegation: plaintiff's argument rests on the fact that § 925(c) itself vests the power to grant firearms disability relief with the "Attorney General," whereas the appropriations restriction, by its own terms, applies only to ATF. Accordingly, plaintiff suggests, the prohibition on spending federal funds on requests for relief does not extend to the Secretary/Attorney General, who therefore has

no excuse not to act. It should be obvious that this theory only has merit insofar as the Secretary/Attorney General actually retains the statutory authority to act on § 925(c) applications despite his formal delegation of that authority to ATF.

The law, however, does not appear to support this proposition. In *U.S. v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Supreme Court reaffirmed its observation in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), that once a regulation has been issued delegating power from one officer to a subordinate, the former may not thereafter invoke the delegated power himself, at least as long as the regulation remains in effect. *Cf.* Thomas McGarity, *Presidential Control of Regulatory Agency Decisionmaking*, 36 AM. U.L. REV. 443, 472 n. 146 (1987) (summarizing *Accardi*).[5] For instance, the *Nixon* Court explained, in *Accardi*, "regulations of the Attorney General delegated certain of his discretionary powers to the Board of Immigration Appeals and required that Board to exercise its own discretion on appeals in deportation cases. The Court held that *so long as the Attorney General's regulations remained operative, he denied himself the authority to exercise the discretion delegated to the Board even though the original authority was his* and he could reassert it by amending the regulations." *Nixon*, 418 U.S. at 695–96, 94 S.Ct. 3090 (emphasis added).

In the present case, it is clear that the Secretary/Attorney General's delegation to ATF with respect to § 925(c) is still operative. *See* 28 C.F.R. § 0.130(a)(1) (providing that ATF "shall ... exercis[e] the functions and powers of the Attorney General under ... [18 U.S.C. § 925(c) ]"). As long as this is so, *Nixon* suggests that the authority (and any concomitant duty) to act upon applications for relief belongs exclusively to ATF. While the Secretary/Attorney General could rescind that delegation, unless and until that happens, he lacks the power to grant or deny § 925(c) applications on his own. And, because any such action would therefore be ultra vires, it could hardly be unlawful or unreasonable for the Secretary/Attorney General to refrain. From this it follows that plaintiff's § 706(1) claim cannot succeed.

■ Moreover, even assuming that, despite the delegation, the Secretary/Attorney General did retain some residual power over plaintiff's application, the Court has little difficulty concluding that there has been no "unlawful" withholding of action in this case. First, the language of § 925(c) vests broad discretion in the Secretary/Attorney General: he *"may* grant such relief if *it is established to his satisfaction"* that certain conditions relating to the public safety and the public interest have been met. 18 U.S.C. § 925(c) (emphasis added). As such, the action that plaintiff here seeks to compel is in no way required by the statute; the use of the word "may" (rather than "shall") indicates that the Secretary/Attorney General has no duty to act, but instead a choice as to when such action is appropriate. *Cf. Appalachian Power Co. v. EPA*, 135 F.3d 791, 807 (D.C.Cir.1998) (discussing the differences between "may" and "shall").

In addition, the trigger for that choice is not an objective determination, but instead a subjective one: whether the official has been satisfied that the relevant conditions have been met, not whether the condition

---

**5.** This doctrine both derives from and embodies the general principle that agencies are obligated to follow their own regulations. *See Parsons v. Dep't of Air Force*, 707 F.2d 1406, 1413 n. 13 (D.C.Cir.1983); Peter Raven–Hansen, *Regulatory Estoppel: When Agencies Break Their Own "Laws,"* 64 TEX. L. REV. 1, 6 (1985).

has in fact been met. By making the option to act hinge upon the Secretary/Attorney General's mental state, the statute confers upon him "virtually unbridled discretion" and leaves a reviewing court with "no meaningful standard against which to judge [his] exercise of discretion." *Drake v. FAA,* 291 F.3d 59, 72 (D.C.Cir.2002) (holding that the use of analogous language left the FAA's decision not to act "committed to agency discretion by law" and thus unreviewable under the APA). Thus, not only does § 925(c) impose no legal duty upon the Secretary/Attorney General to process applications in a particular time or manner, but the circumstances under which action is even appropriate are not ascertainable by objective evidence. To find that the Secretary/Attorney General had acted contrary to the terms of the statute, a court would first have to conclude that a distinct set of facts had actually been established "to his satisfaction." This is a virtually impossible task. Accordingly, § 925(c) leaves the Court with no basis on which to determine that the Secretary/Attorney General's withholding of action on plaintiff's application is unlawful. In these circumstances, the Court lacks the power under the APA to compel agency action. *Cf. Am. Ass'n of Retired Pers v. EEOC,* 823 F.2d 600, 605 (D.C.Cir.1987) (suggesting that § 706(1) claim will not lie where the agency is under no legal duty to act).

■ Of course, on top of this ample discretion stands the appropriations ban itself. For, even if that ban does not formally prohibit the Secretary/Attorney General from acting pursuant to § 925(c), its existence (as the Supreme Court noted in *Bean* ) surely and properly informs his exercise of discretion. In enacting the restriction each year since 1992, Congress has sent a clear signal that it wished to disable the firearms relief provision. The legislative history of the ban confirms this. *See* S. REP. NO. 102–253 (July 31, 1992);

H.R. REP. NO. 102–618 (June 25, 1992). As the Third Circuit recently observed, these committee reports "indicate that Congress wanted to suspend § 925(c)'s relief procedure because it was concerned that dangerous felons were regaining their firearms privileges and because it believed that the resources allocated to investigating felons' applications would be better used to fight crime." *Pontarelli v. Dep't of Treasury,* 285 F.3d 216, 226 (3d Cir. 2002); *see also United States v. McGill,* 74 F.3d 64, 67 (5th Cir.1996) ("By withdrawing funds to the ATF to process these applications under these circumstances and with this explanation by the appropriations committee, it is clear to us that Congress intended to suspend the relief provided by § 925(c).").

■ Against this backdrop, it would have been most unusual for the Secretary/Attorney General to circumvent congressional expectations by taking it upon himself to act on plaintiff's request for relief. Certainly, Congress has provided no indication that it intended the Secretary/Attorney General to take on the task that it had specifically prevented ATF from doing. Nor does the fact that Congress extended the appropriations ban only to ATF itself help plaintiff in this regard. In light of the Secretary/Attorney General's long-standing and ongoing delegation to the ATF, it would have been entirely reasonable for Congress to conclude that defunding ATF would be sufficient to stop all § 925(c) applications from being processed. Indeed, it is likely that Congress did not impose a similar appropriations restriction on the entire Treasury and Justice Departments simply because it did not believe such a restriction was necessary in order to effectively suspend operation of the firearms relief statute. Because executive branch officials are entitled (if not obliged) to pay

attention to changes in the broader legal landscape in deciding how to exercise the discretion granted them by particular statutes, the Court cannot conclude that the Secretary/Attorney General acted unlawfully or unreasonably in refusing to process plaintiff's application.[6]

## II. *Plaintiff's Due Process Claim*

As an alternative argument, plaintiff argues that insofar as the Secretary/Attorney General lacks the power to grant a § 925(c) application, the absence of a mechanism for the restoration of federal firearms privileges itself violates the Due Process Clause. The claim here is that § 922(g) operates on the assumption that convicted felons are too dangerous to possess firearms, an assumption that is only constitutional insofar as there is some individualized opportunity for felons to demonstrate otherwise. Otherwise the statute creates an "irrebutable presumption" of the sort that a line of older Supreme Court cases suggests is constitutionally suspect.

The irrebuttable presumption doctrine on which plaintiff relies reached its pinnacle in *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), where the Court struck down a Connecticut statute that classified anyone living out of state at the time of application to a state university to be a nonresident for purposes of tuition and fees. This classification remained for as long as the student was enrolled at the university. *Id.* at 442–43, 93 S.Ct. 2230. Striking down this law, the Court declared that:

> it is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of nonresidence, when that presumption is not necessarily or universally true, in fact, and when the State has reasonable alternative means of making the crucial determination. Rather, standards of due process require that the State allow such an individual the opportunity to present evidence showing that he is a bona fide resident entitled to the in-state rates.

*Id.* at 452, 93 S.Ct. 2230; *see also Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 644–45, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (using the irrebutable presumption analysis to strike down a law that required pregnant school teachers to leave their jobs without pay several months before the expected due dates). As aptly described by the Fifth Circuit, this doctrine

> forced the government to grant hearings to persons who claimed to have been wrongly trapped inside overinclusive classifications; the idea was that even if

---

**6.** The considerations described above also doom plaintiff's bid for a writ of mandamus. The mandamus statute gives federal district courts jurisdiction "of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a *duty* owed to the plaintiff." 28 U.S.C. § 1361 (emphasis added). Thus, in the absence of a duty—whether imposed by statute, regulation, or some other legal source—there can be no relief. *See Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476, 1480 (D.C.Cir.1995) (quoting *13th Reg'l Corps. v. Dep't of the Interior*, 654 F.2d 758, 760 (D.C.Cir.1980)) (mandamus available against the Attorney General only where "the duty to be performed is ministerial and the obligation to act peremptory and clearly defined"). "The courts do not have authority under the mandamus statute to order *any* government official to perform a discretionary duty." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C.Cir.1996); *see also 13th Reg'l Corp.*, 654 F.2d at 760 ("The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable."). And here, the significant discretion that § 925(c) gives to the Secretary/Attorney General to grant a felon's application for reinstatement of firearms privileges leaves no room for this Court to use its mandamus jurisdiction to compel the exercise of that discretion.

a person clearly fell within a legislative class, due process required that he be given the opportunity to show that he "really" (that is, according to the "true" purpose or justification for the distinction) belonged on the other side of the legislative line.

*Brennan v. Stewart*, 834 F.2d 1248, 1258 (5th Cir.1988); *see also* GERALD GUNTHER & KATHLEEN SULLIVAN, CONSTITUTIONAL LAW 914 (13th ed.1997) (suggesting that this approach is "in substance similar to very intensive scrutiny of legislative generalizations"); Note, *The Irrebuttable Presumption Doctrine in the Supreme Court*, 87 HARV. L. REV. 1534, 1548 (1974) ("*Irrebuttable Presumptions*") (observing that the doctrine is a "strange hybrid of due process and equal protection scrutiny").

There can be little doubt, however, that more recent developments in constitutional law have significantly limited, if not altogether abrogated, the irrebutable presumption doctrine. Indeed, shortly after *Vlandis* and *LaFleur* were decided, the Court limited, if not eviscerated, the mode of analysis adopted by those cases. In *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), the Court confronted a provision of the Social Security Act that prohibited a wage earner's widow or stepchild from receiving insurance benefits unless their relationship to the wage earner had existed more than nine months prior to his death. This requirement was designed to prevent the use of sham marriages to obtain Social Security benefits. The Court upheld the provision, in the process rejecting an argument that because it established an irrebuttable

presumption, it was constitutionally defective.

The Court dealt specifically with *Vlandis* in two ways. First it limited the irrebuttable presumption doctrine to situations where a statute purports to be concerned with one issue (in *Vlandis*, it was the residency of university applicants), but at the same time denies individuals "the opportunity to show factors clearly bearing on that issue." *Id.* at 771, 95 S.Ct. 2457; *cf. Toll v. Moreno*, 458 U.S. 1, 6 n. 7, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982) (describing *Salfi*'s limiting effect on *Vlandis*). This appears to narrow the *Vlandis* analysis to cases in which the legislature is engaged in a kind of sleight-of-hand, feigning interest in one concern only then to erect a classification that excludes evidence obviously relevant to that concern.[7]

■ Second, the Court put forward a general rule of law that seems to replace the exacting irrebutable presumption analysis with a far more deferential set of standards:

> Under those standards, the question raised is not whether a statutory provision precisely filters out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions, and would be directly contrary to our holding in *Mourning* [*v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) ].... The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it

---

7. Thus, *Salfi* distinguished the Connecticut residency requirement by observing that "[u]nlike the statutory scheme in *Vlandis*, the Social Security Act does not purport to speak in terms of the bona fides of the parties to a marriage, but then make plainly relevant evidence of such bona fides inadmissible." 422 U.S. at 772, 95 S.Ct. 2457 (citation omitted).

Indeed, the Court went on to note that an extension of the irrebuttable presumption analysis could turn the doctrine into "a virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with the Fifth and Fourteenth Amendments to the Constitution." *Id.*

legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule. *Id.* at 777, 95 S.Ct. 2457. Here, then, irrebuttable presumptions (which, after all, are simply another way to describe legislative classifications, *see Irrebuttable Presumptions*, at 1556) are not *per se* suspect. Instead, their constitutionality turns on whether Congress has a rational basis for drawing the line that it did, that is, whether there is a logical relationship between the problem identified and the means chosen to address it. Moreover, the imprecision of the classification is not fatal so long as there is reason to believe that a more precise solution would have been too expensive or administratively cumbersome to be workable. *Cf. Michael H. v. Gerald D.*, 491 U.S. 110, 120–21, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (plurality opinion) ("Thus, as many commentators have observed, our 'irrebuttable presumption' cases must ultimately be analyzed as calling into question not the adequacy of procedures, but—like our cases involving classifications framed in other terms—the adequacy of the 'fit' between the classification and the policy that the classification serves.") (citations omitted).

While the Court has never expressly overruled *Vlandis*, the irrebuttable presumption doctrine has been essentially moribund since *Salfi* was decided.[8] After *Salfi*, the doctrine has never been used to strike down a legislative enactment, and indeed (at least outside of the context of residency requirements for in-state tuition) has not even been suggested as a possible basis for doing so since 1976. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 23–24, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (upholding Black Lung statute despite its use of a irrebuttable presumption of disability); *Lavine v. Milne*, 424 U.S. 577, 584 n. 9, 96 S.Ct. 1010, 47 L.Ed.2d 249 (1976) (distinguishing irrebuttable presumption cases from a welfare statute in which "nothing is conclusively presumed against the applicant"). Moreover, the lower federal courts have delivered their eulogies for this mode of analysis. *See Hawkins v. Agric. Mktg. Serv.*, 10 F.3d 1125, 1133 (5th Cir.1993) (describing the irrebutable presumption doctrine as having been "repudiated" by *Salfi*); *Gorrie v. Bowen*, 809 F.2d 508, 524 n. 25 (8th Cir. 1987) (noting uncertainty about the "continuing force" of that approach); *Brennan*, 834 F.2d at 1258 (suggesting that *Salfi* effectively overruled the *Vlandis/LaFleur* analysis); *Schanuel v. Anderson*, 708 F.2d 316, 319 (7th Cir.1983) ("The irrebuttable presumption doctrine has been discredited because it is unworkable regardless of the interest which might have invoked it.").

These developments have led a leading constitutional treatise to conclude that the doctrine has now been "abandoned as a generally acceptable approach," and that if it survives today, it does so only where there are "independent reasons" for heightened scrutiny, such as where "fundamental interests" are threatened. GUNTHER & SULLIVAN, at 915 & n. 4. In this sense, the irrebuttable presumption analysis has simply collapsed into the ordinary equal protection/due process analysis, which applies heightened scrutiny only to those classifications that burden particular

---

8. In *Elkins v. Moreno*, 435 U.S. 647, 660–61, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978), found that it was unnecessary under the circumstances of that case to reach a "decision on the continuing vitality of *Vlandis*." Dissenting several years later in *Toll v. Moreno*, then-Justice Rehnquist noted that "[t]here is legitimate doubt at this late date whether anything remains of *Vlandis v. Kline* but its lifeless words on the pages of these Reports." 458 U.S. at 48, 102 S.Ct. 2977 (Rehnquist, J., dissenting).

rights or classes of persons to which the courts have afforded special protection. *See, e.g., Reno v. Flores,* 507 U.S. 292, 301–02, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (due process); *Zablocki v. Redhail,* 434 U.S. 374, 383–87, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (due process); *Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (due process); *Fitzgerald v. Racing Ass'n of Cent. Iowa,* — U.S. —, —, 123 S.Ct. 2156, 2159, — L.Ed.2d —, — (2003) (equal protection); *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (equal protection); *Massachusetts Bd. of Ret. v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (equal protection).

■ Indeed, many of the statutory schemes assessed in such cases have features that could have been construed as irrebuttable presumptions; nevertheless, the Court has not elected to evaluate them in those terms, but instead has simply asked whether—in the absence of a fundamental right or suspect class—the state interest asserted is a legitimate one and whether the line drawn by the legislature represents a reasonable means of advancing that interest.[9] This is the approach that the Court will follow here. Doing so, it is clear that heightened scrutiny is not appropriate. Convicted felons have not been recognized as a suspect class. *See Baer v. City of Wauwatosa,* 716 F.2d 1117, 1125 (7th Cir.1983). Nor is their right to bear arms subject to special constitutional protection. *See Lewis v. United States,* 445 U.S. 55, 65 n. 8, 100 S.Ct. 915, 63 L.Ed.2d 198 (suggesting that legislative restrictions on the possession of firearms by felons do not "trench upon any constitutionally protected liberties").[10]

9. For example, in *Murgia,* the Court upheld a Massachusetts law that forced state police officers to retire at age 50. Despite that fact that such a law could readily be described as applying an irrebuttable presumption that officers beyond that age were unfit for service, the Court upheld the statute applying only rational basis review. "This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is particularly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary." 427 U.S. at 314, 96 S.Ct. 2562.

Similarly, in *Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979), the Court upheld mandatory retirement at age 60 for Foreign Service officers, even after acknowledging that this classification was possibly imperfect, as it excluded regular civil servants who might have demanding overseas posts and included older members of the foreign service who might, despite their age, be ready and able to continue in their positions. If rational, the Court concluded, such legislative classifications need not be precise to be constitutional. Instead, Congress was entitled to draw "a line around those groups of employees it thought most generally pertinent to its objective. Whether we, or the District Court, think Congress was unwise in not choosing a means more precisely related to its primary purpose is irrelevant." *Id.* at 109, 99 S.Ct. 939.

These cases provide an particularly stark example of the move away from the irrebuttable presumption approach in evaluating classifications. Thus, whereas *Vlandis* demanded a rigorous showing that the basis for the government's presumption is "universally" true, the Court in *Vance* held that when a due process challenge to a classification turns on a "disputed historical fact," the party "challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Id.* at 111, 99 S.Ct. 939.

10. The Court recognizes the debate currently taking place over the degree to which the Second Amendment grants an individual the right to bear arms. *Compare Silveira v. Lockyer,* 312 F.3d 1052 (9th Cir.2002) (holding that the Amendment enshrines no individual right to own or possess firearms, and therefore that only rational basis review was appropriate for an equal protection challenge to

Where neither fundamental rights nor suspect classes are threatened, the analysis—whether under due process or equal protection—is the same. The law at issue is presumed to be constitutional, and survives review so long as it rationally may be thought to further a legitimate governmental interest. *See Washington v. Glucksberg,* 521 U.S. 702, 728, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (due process); *Heller v. Doe,* 509 U.S. 312, 319–20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (equal protection). The question, in other words, is simply whether the classification devised can be considered a reasonable way of addressing the legislature's underlying concern. There can be little doubt here that this is so with respect to the ban on firearms possession by convicted felons. Indeed, this issue has already been considered and decided by the Supreme Court. In *Lewis v. United States,* the Court upheld 18 U.S.C. § 1202(a)(1), a provision virtually identical to § 922(g)(1),[11] against the argument that the statute violated equal protection insofar as it allowed firearms disabilities to be imposed on person's convicted of felonies without the benefit of counsel (and thus in violation of *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)).

■ Applying rational basis review, *Lewis* had little trouble concluding that Congress' decision to preclude all felons from possessing firearms was reasonable:

> The legislative history of the gun control laws discloses Congress' worry about the easy availability of firearms, especially to those persons who pose a threat to community peace. And Congress focused on the nexus between violent crime and the possession of a firearm by any person with a criminal record. Congress could rationally conclude that any felony conviction, even an allegedly invalid one, is a sufficient basis on which to prohibit the possession of a firearm.

445 U.S. at 66, 100 S.Ct. 915 (internal citation omitted). In other words, felon status is an adequate—even if not exact—proxy to identify "especially risky people," whose possession of firearms may be expected to jeopardize public safety. *Dickerson v. New Banner Inst., Inc.,* 460 U.S. 103, 120, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983) (citing *United States v. Bass,* 404 U.S. 336, 345, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)). And, because it is rational for Congress to have believed that those who have demonstrated a willingness to break the law in the past should not be trusted with guns in the future, the Fifth Amendment does not require that the prohibition

California's assault-weapons ban) *with United States v. Emerson,* 270 F.3d 203 (5th Cir. 2001) (holding that the Second Amendment protects the right of individuals to keep and bear arms). Other than the Fifth, no circuit has adopted the individual rights view; the D.C. Circuit taken no position at all. *See Silveira,* 312 F.3d at 1063 n. 11 (citing cases); *cf. Fraternal Order of Police v. United States,* 152 F.3d 998, 1002 (D.C.Cir.1998) (declining to "resolve the status" of the Second Amendment). This case, however, does not require the Court to consider this debate, since even the Fifth Circuit in *Emerson* recognized that certain categories of persons are excluded from the protections offered by the Amendment: "it is clear that *felons,* infants, and

those of unsound mind may be prohibited from possessing firearms." 270 F.3d at 261 (emphasis added); *cf.* Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment,* 82 MICH. L. REV. 204, 266 (1983) ("Felons simply did not fall within the benefits of the common law right to possess arms.... Nor does it seem that the Founders considered felons within the common law right to arms or intended to confer any such right upon them.").

11. Section 1202(a) criminalized the possession of a firearm by any person "convicted by a court of the United States or of a State or any political subdivision thereof of a felony." *Lewis,* 445 U.S. at 56 n. 1, 100 S.Ct. 915.

on felon possession be limited only to the most menacing subclass of felons.

While the Supreme Court's ratification of that judgment is sufficient to end this analysis, it is worth pointing out that constitutional claims of the sort advanced here have consistently been rejected by the federal courts. *See United States v. McKenzie,* 99 F.3d 813, 817–20 (7th Cir.1996) (holding that Congress was not "irrational" in keeping guns away from convicted felons and thus rejecting defendant's argument that § 922(g)(1) violated due process because its "real purpose" was not to prevent non-violent felons from possessing firearms); *United States v. Weatherford,* 471 F.2d 47, 52 (7th Cir.1972) (describing the classification made by § 922(g)(1) as "reasonable and practical" and thus not a violation of the Fifth Amendment); *United States v. Fauntleroy,* 488 F.2d 79, 81 (4th Cir.1973) (same). As these decisions recognize, the classification drawn here—even if overbroad in some instances—certainly represents a reasonable means of keeping firearms away from potentially dangerous persons, which was the concern that led Congress to enact the legislation in the first place. *See Lewis,* 445 U.S. at 67, 100 S.Ct. 915. As such, the solution "fits" the problem, and the classification cannot be challenged as an unlawful irrebuttable presumption offensive to the Due Process Clause.

It may be, however, that plaintiff's claim, though styled in terms of the irrebuttable presumption doctrine, is really one of *procedural* due process. While the Supreme Court has suggested that the irrebuttable presumption analysis is rooted in *substantive* due process, *see Michael H.,* 491 U.S. at 120, 109 S.Ct. 2333 (plurality opinion), such claims obviously have a strong procedural flavor as well. Indeed, in distinction to most substantive due process claims, the ultimate remedy that plaintiff seeks is not a declaration that the classification itself is impermissible (that convicted felons may not be barred from possessing firearms), but instead the establishment of certain procedural safeguards that would (he believes) protect him against suffering the sanction that Congress has deemed appropriate for members of the disfavored class. *Cf. Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (distinguishing between these two modes of analysis under the Due Process Clause).

To be sure, this demand differs from a standard procedural due process case, in which plaintiffs typically seek a hearing to show that they have been improperly assigned to the disfavored group.[12] Here, in contrast, plaintiff concedes that he is a convicted felon. At the same time, however, he wants an individualized opportunity

---

**12.** Examples of this kind of procedural due process case abound. *See, e.g., Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (mental patient sought determination that he had voluntarily consented to admission to treatment facility before he could constitutionally be placed in such facility); *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) (driver whose license had been suspended sought hearing to determine whether he actually met the statutory criteria for suspension); *Haig v. Agee,* 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (individual sought determination that due process barred the govern-

ment from revoking a passport on national security grounds in the absence of a pre-revocation hearing to determine whether he was actually a national security risk); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare recipients sought pre-termination hearing to show that they were not actually ineligible for welfare payments); *cf. Carey v. Piphus,* 435 U.S. 247, 259, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property.").

to prove that the general reason for which the classification was established does not apply in his individual circumstances. In other words, plaintiff seeks a hearing in which he hopes to show that the "true purpose" of the legislative classification (which, he suggests, is to keep guns out of the hands of violent individuals) is not actually furthered by applying the sanction to him. *See Irrebuttable Presumptions,* at 1547 ("The concern of the Court [when applying the irrebuttable presumption doctrine] is not whether the complainants do in fact belong to the group disadvantaged by the classification, but rather whether the individuals disadvantaged by the classification have been accurately grouped with respect to the statutory purpose.")

█ That is, plaintiff is asking not for a determination that Congress' decision to preclude all felons from possessing firearms is impermissible, but is instead asserting that he may not be deprived of his right to bear arms without first being afforded the chance to show that he is not dangerous. The Court believes, however, that such an argument is foreclosed by the Supreme Court's recent decision in *Connecticut Department of Public Safety v. Doe,* 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003). In *Doe,* the Court rejected a procedural due process challenge to Connecticut's sex offender registry. That version of "Megan's Law" required all persons convicted of certain sex-related crimes to register with the State following their release from prison. A class comprised of convicted sex offenders challenged the law, claiming that it offended due process by subjecting them to various reporting requirements (and thus impinging upon their liberty) without affording them a hearing to determine whether they (as individuals) were likely to be currently dangerous to the community.

The Supreme Court held that individualized hearings were not required because the state had made clear that the registration requirement was based "on the fact of previous conviction, not on the fact of current dangerousness." *Id.* at 1163. Under such circumstances, a hearing dealing with the question of dangerousness would be a "bootless exercise." *Id.* at 1164. After *Doe,* then, it remains true that in certain instances, before liberty may be taken away, due process requires the government to afford individuals a hearing "to prove or disprove a particular fact or set of facts." *Id.* However, where the fact to be proven at the hearing is not relevant to the legal scheme responsible for the deprivation (that is, where it is clear that the government would strip the individual of his liberty even if he were able to prove or disprove the particular the fact or set of facts), such a hearing would be an exercise in futility, which is not required by *procedural* due process. *Cf. Bell v. Burson,* 402 U.S. 535, 541, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (assuming that procedural due process would not be jeopardized if the issue to be resolved in an individualized hearing was "irrelevant to the statutory scheme").

This understanding of due process dooms any procedural challenge to § 922(g)(1). The plain language of that provision makes clear Congress' decision to bar *all* convicted felons (not merely those with violent tendencies or who otherwise present an ongoing danger to society) from possessing firearms. Just as Connecticut may have been trying to prevent further sex offenses by requiring the registration of those likely to commit such crimes again, it may be, as plaintiff assumes, that Congress' ultimate goal in enacting the statute was to minimize the social risk associated with guns by withholding them from those likely to use them illegally. However, in both cases, the laws actually enacted are not so limited. Both

schemes make the deprivation turn solely on the fact of the prior conviction—not the significance of that conviction for future behavior. *See Lewis,* 445 U.S. at 67, 100 S.Ct. 915 ("The federal gun laws ... focus not on reliability, but on the mere fact of conviction ... in order to keep firearms away from potentially dangerous persons."); *McKenzie,* 99 F.3d at 819 (discussing the broad sweep of § 922(g)(1)). Accordingly, the holding of *Doe* applies equally here: due process does not entitle plaintiff to a hearing to determine whether he is currently dangerous because the results of such a hearing would have no bearing on whether he is subject to the disability imposed by § 922(g)(1). And because, as discussed above, the substantive classification drawn by Congress—which keeps firearms out of the hands of all convicted felons, not just those who represent an ongoing threat to society—is not so arbitrary or unreasonable as to violate the Fifth Amendment, plaintiff's constitutional challenge to the effective suspension of 18 U.S.C. § 925(c) must be rejected.

### CONCLUSION

For the reasons given above, the Court grants defendant's motion for summary judgment as to all counts.

### *ORDER*

For the reasons given in the attached Memorandum Opinion, it is hereby

**ORDERED** that defendant's Motion to for Summary Judgment [20–2] is **GRANTED;** and it is

**FURTHER ORDERED** that this case is dismissed **WITH PREJUDICE.**

This is a final appealable order.