**[J-25-2023] [MO:Todd, C.J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 97 MAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Chester County Court of Common |
| | : | Pleas, Criminal Division, dated |
| v. | : | August 22, 2022 (filed on August 23, |
| | : | 2022) at No. CP-15-CR-1570-2016. |
| | : | |
| GEORGE J. TORSILIERI, | : | ARGUED:  May 23, 2023 |
| | : | |
| Appellee | : | |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                                                      **DECIDED:  May 31, 2024**

This is the latest in a long line of cases weighing constitutional challenges to statutes that impose registration and notification obligations upon convicted sexual offenders.[1]  George Torsilieri,[2] who must comply with these requirements for the rest of

---

[1]      *See*, *e.g.*, *Commonwealth v. Gaffney*, 733 A.2d 616 (Pa. 1999) (Megan's Law I); *Commonwealth v. Williams*, 733 A.2d 593 (Pa. 1999) ("*Williams I*") (Megan's Law I); *Commonwealth v. Williams*, 832 A.2d 962 (Pa. 2003) ("*Williams II*") (Megan's Law II); *Commonwealth v. Killinger*, 888 A.2d 592 (Pa. 2005) (Megan's Law II); *Commonwealth v. Wilson*; 910 A.2d 10 (Pa. 2006) (Megan's Law II); *Commonwealth v. Neiman*, 84 A.3d 603 (Pa. 2013) (Megan's Law III); *Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017) (SORNA I); *Commonwealth v. Lacombe*, 234 A.3d 602 (Pa. 2020) (SORNA II).

[2]      Torsilieri is a convicted sexual offender.  Following a jury trial, Torsilieri was convicted of aggravated indecent assault, 18 Pa.C.S. § 3125, and simple assault, 18 Pa.C.S. § 2701.  He was evaluated by a member of the Sexual Offenders Assessment Board, *see* 42 Pa.C.S. § 9799.24(b), which determined that Torsilieri was not a sexually violent predator.  *See* 42 Pa.C.S. § 9799.12 (defining the term "sexually violent predator").  Thereafter, the trial court sentenced Torsilieri to one year less one day to two years less two days in jail.  On the same day, the trial court directed him to comply with all applicable SORNA requirements.

his life,[3] attacks Subchapter H of SORNA II[4] on two fronts.  First, he argues that the legislative premise upon which SORNA II is grounded—that sexual offenders pose a higher risk of recidivism than other types of convicted offenders—amounts to an unconstitutional irrebuttable presumption, which, in turn, violates his state constitutional right to reputation.[5]  Second, he argues that SORNA II is punitive in nature and, thus, violates the Sixth Amendment's right to trial by jury,[6] the Eighth Amendment's prohibition of cruel and unusual punishments,[7] and the foundational principle of separation of powers.

Today's Majority concludes that Torsilieri has not carried his "heavy burden"[8] of demonstrating that SORNA's legislative policy choices have created an unconstitutional, irrebuttable presumption.  The Majority acknowledges the deficiencies inherent in the irrebuttable presumption doctrine, the broad criticisms that it has engendered, and the fact that federal courts no longer apply it.[9]  The Majority nonetheless allows that doctrine

---

[3]    SORNA II categorizes aggravated indecent assault as a Tier III offense.  *See*  42 Pa.C.S. § 9799.14(d).  Therefore, Torsilieri must comply with Subchapter H of SORNA II for life.  *See* 42 Pa.C.S. § 9799.15(a)(3).

[4]    SORNA is the acronym for the "Sexual Offender Registration and Notification Act," 42 Pa.C.S. §§ 9799.11-9799.75.  Following our decision in *Muniz* invalidating the then-applicable SORNA I, the General Assembly enacted a new statutory scheme, SORNA II.  The new scheme bifurcated the law into two distinct subchapters:  Subchapter H, which governs offenders whose triggering offenses occurred on or after December 20, 2012, *see* 42 Pa.C.S. § 9799.12 (defining a "sexually violent offense" for purposes of Subchapter H), and Subchapter I, which governs those offenders whose sexual offenses were committed prior to that date, *see* 42 Pa.C.S. § 9799.53 (defining "sexually violent offense" for purposes of Subchapter I).

[5]    Pa. Const. art. 1, § 1.

[6]    U.S. Const. amend VI.

[7]    U.S. Const. amend VIII.

[8]    Maj. Op. at 37.

[9]    *Id.* at 26-27.

to persist in Pennsylvania, albeit for no better reason than inertia. That this Court has "continued to employ"[10] this defunct doctrine is not a sufficient reason for us to perpetuate it in our law, especially when it has been widely rejected or abandoned almost since its inception. I would follow the path paved for us by the Supreme Court of the United States and by numerous federal courts, and would bury the doctrine once and for all. Thus, I concur only in the result reached by the Majority on this issue.

Next, after balancing the various aspects of SORNA II using the *Martinez-Mendoza*[11] model and finding that Subchapter H is not punitive, the Majority rejects Torsilieri's remaining constitutional challenges. I disagree. As I concluded previously with regard to Subchapter I, because Subchapter H "restrains the offender's liberty, resembles punishment, and is aimed at deterrence and retribution," it is punitive in nature.[12] Thus, I respectfully dissent from this aspect of the Majority Opinion.

## I.        The Irrebuttable Presumption Doctrine

---

[10]     *Id.* at 27. The Majority also justifies its continued recognition and application of the irrebuttable presumption doctrine by noting that neither party here challenges the "continued vitality" of the doctrine in Pennsylvania. *Id.* The fact that a party has not requested the overruling of a precedent is no categorical impediment to such overruling, inasmuch as this would at times render us helpless to abrogate indefensible, unsustainable, or conflicting case law. *See Commonwealth v. Jackson*, 302 A.3d 737, 773 n.38 (Pa. 2023) (Wecht, J., Opinion in Support of Reversal); *Commonwealth v. Ortiz*, 197 A.3d 256, 262 n.1 (Pa. 2018) (Wecht, J., dissenting); *Cagey v. Commonwealth*, 179 A.3d 458, 473 n.7 (Pa. 2018) (Wecht, J., concurring); *William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 170 A.3d 414, 446 n.49 (Pa. 2017) ("We would encourage the perpetuation of poorly reasoned precedent were we to permit ourselves to revisit the soundness of our case law only when expressly invited to do so based upon a given party's tactical decision of whether to attack adverse case law frontally . . . or to attempt more finely to distinguish the adverse decisions. The scope of our review is not so circumscribed.").

[11]     *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963). In *Mendoza-Martinez*, the United States Supreme Court identified seven factors to help guide courts in determining whether a statutory scheme is punitive. *Id.* at 168-69. I discuss those factors in more detail below.

[12]     *See Lacombe*, 234 A.3d at 659-60 (Wecht, J., concurring and dissenting).

The origin of the irrebuttable presumption doctrine often is traced to the United States Supreme Court's 1971 decision in *Bell v. Burson*.[13] But the doctrine actually is of older vintage. It set down its roots decades earlier in a series of decisions in which the Supreme Court invalidated several tax laws, beginning with *Schlesinger v. Wisconsin*.[14] That case involved a Wisconsin statute which required gifts made within six years before death to be considered part of the donor's taxable estate.[15] The Wisconsin law "plainly [undertook] to raise a conclusive presumption" that all such gifts "were made in anticipation of" death.[16] This presumption, the Court opined, was "declared to be conclusive and cannot be overcome by evidence. It is no mere *prima facie* presumption of fact."[17] The Court invalidated the provision, ruling that the legislative judgment upon which it was predicated created arbitrary distinctions between gifts transferred before and after six years "without regard to actualities," and which were "in plain conflict with the Fourteenth Amendment."[18] The Court rejected the argument that a state's policy determination to minimize inheritance tax avoidance could allow that state to impose consequences on citizens who exercise their right to distribute property. To uphold such a law, the Court determined, would be to subordinate the rights of the individual to the purported needs of the state: "Rights guaranteed by the federal Constitution are not to be so lightly treated; they are superior to this supposed necessity. The state is forbidden

---

[13] 402 U.S. 535 (1971). See James M. Binnall, Sixteen Million Angry Men: Reviving a Dead Doctrine to Challenge the Constitutionality of Excluding Felons from Jury Service, 17 Va. J. Soc. Pol'y & L. 1, 5 (2009); Note, The Irrebuttable Presumption Doctrine in the Supreme Court, 87 Harv. L. Rev. 1534, 1540-41 (1974).

[14] 270 U.S. 230 (1926).

[15] *Id.* at 236, 240.

[16] *Id.* at 239.

[17] *Id.*

[18] *Id.* at 240.

to deny due process of law or the equal protection of the laws for any purpose whatsoever."[19]

The United States Supreme Court used similar reasoning in two subsequent tax cases, *Hoeper v. Tax Commission*[20] and *Heiner v. Donnan*.[21]  In *Hoeper*, the Court reviewed a tax statute which provided that, in computing the aggregate amount of income tax payable by a family, a wife's income was added to the husband's, and then assessed to, and payable by, the husband.  The Court held that, "since in law and in fact the wife's income was her separate property, the state was without power to measure his tax in part by the income of his wife."[22]  The Court had "no doubt that, because of the fundamental conceptions which underlie our system, any attempt by a state to measure the tax on one person's property or income by reference to the property or income of another is contrary

---

[19]  *Id.*  Even then, in the full bloom of the *Lochner* Era, this expansive use of the Fourteenth Amendment's Due Process Clause did not sit well with some.  In a dissent that foreshadowed some of the criticisms that would follow, Justice Holmes opined that the Court should be more deferential to the policy choices that legislators make:

> I am not prepared to say that the legislature of Wisconsin, which is better able to judge than I am, might not believe, as the Supreme Court of the State confidently affirms, that by far the larger proportion of the gifts coming under the statute actually were made in contemplation of death.  I am not prepared to say that if the legislature held that belief, it might not extend the tax to gifts made within six years of death in order to make sure that its policy of taxation should not be escaped.  I think that with the States as with Congress when the means are not prohibited and are calculated to effect the object we ought not to inquire into the degree of the nevessity [*sic*] for resorting to them.

*Id.* at 242 (Holmes, J., dissenting).  Justices Brandeis and Stone joined Justice Holmes' dissent.

[20]  284 U.S. 206 (1931).

[21]  285 U.S. 312 (1932).

[22]  *Id.* at 326.

to due process of law as guaranteed by the Fourteenth Amendment. That which is not in fact the taxpayer's income cannot be made such by calling it income."[23]

The federal tax provision at issue in *Heiner* treated all gifts or transfers of value made within two years of death as part of the gross taxable estate of the decedent.[24] The validity of the provision, the Court explained, hinged upon whether Congress has "the constitutional power to deny" the decedent's heirs the opportunity to demonstrate that the inter vivos gift was not made in contemplation of death in order to decrease the gross amount of a soon-to-be taxable estate.[25] The Court had "no doubt" that Congress has the authority to require that gifts made for such purpose be included in the estate, and that it could create a "rebuttable presumption" that gifts made during a prescribed period before death are made in contemplation thereof.[26] However, that is not what Congress did. The provision flowed from an irrebuttable presumption, one that is "made definitively conclusive-incapable of being overcome by proof of the most positive character."[27] Although legislatures enjoy vast policymaking discretion, "a statute which imposes a tax upon an assumption of fact which the taxpayer is forbidden to controvert is so arbitrary and unreasonable that it cannot stand under the Fourteenth Amendment."[28]

---

[23]     *Hoeper*, 284 U.S. at 215. In dissent, Justice Holmes, joined by Justices Brandeis and Stone, discerned no constitutional defect in a law built upon an irrebuttable premise that "might reach innocent people." *Id.* at 220 (Holmes, J., dissenting). "It has been decided too often to be open to question that administrative necessity may justify the inclusion of innocent objects or transactions within a prohibited class." *Id.* at 220-21.

[24]     *Heiner*, 285 U.S. at 320.

[25]     *Id.* at 322.

[26]     *Id.* at 324.

[27]     *Id.*

[28]     *Id.* at 325.

After *Heiner* and *Hoeper*, the irrebuttable presumption doctrine lay dormant for decades until *Bell* revived it in 1971. There, the Court reviewed a Georgia statute that required "the motor vehicle registration and driver's license of an uninsured motorist involved in an accident . . . be suspended unless he posts security to cover the amount of damages claimed by aggrieved parties in reports of the accident."[29] Under the Georgia law, the driver was afforded an administrative hearing before the suspension, but was precluded from introducing evidence at that hearing to show that he was not at fault for the accident.[30]

The Court noted that a driver's license, once issued, "may become essential in the pursuit of a livelihood."[31] Thus, a state may not deprive an individual of such property interest "without that procedural due process required by the Fourteenth Amendment."[32] The Georgia statute before the Court created the irrebuttable presumption that an uninsured driver in an accident was at fault for the accident. Such a statute failed to afford adequate procedural due process. The Court explained that, "[s]ince the statutory scheme makes liability an important factor in the [s]tate's determination to deprive an individual of his licenses, the [s]tate may not, consistently with due process, eliminate consideration of that factor in its prior hearing."[33] A hearing must be "meaningful" and "appropriate to the nature of the case," one in which a person has a fair opportunity to

---

[29]  *Bell*, 402 U.S. at 535-36 (footnote omitted).

[30]  *Id.* at 536.

[31]  *Id.* at 539.

[32]  *Id.* (citations omitted).

[33]  *Id.* at 541.

rebut the central factor being used to deprive him of a protected interest.[34]  The hearing

afforded by the Georgia statute did "not meet this standard."[35]

Notably, however, the *Bell* decision did not rest entirely or even principally upon

procedural due process.  The Court premised its ruling more directly upon the substantive

inadequacies it discerned in the statute's legislatively-drawn classifications.  The Court

took pains to explain what the Georgia legislature could have done under the Fourteenth

Amendment, to expound upon why the policy underlying the law was insufficient, and to

offer constitutionally acceptable alternatives.[36]  The Court did not invoke the term

"irrebuttable presumption," but, by delving so deeply into the legislative policy-making, it

set the stage for the decisions to come.  And it set the stage for criticisms that would

follow as well.

One year after *Bell*, the Court returned to the irrebuttable presumption doctrine.

*Stanley v. Illinois*[37] concerned an Illinois law that designated both the mother and father

of children born in wedlock as "parents" but included only the mother when the child was

born out of wedlock. [38]  An unwed father was not a "parent."  When the State of Illinois

---

[34]     *See id.* at 541-42.

[35]     *Id.* at 542.

[36]     *See id.* at 539 (explaining that the statute could "[bar] the issuance of licenses to
all motorists who did not carry liability insurance or who did not post security"); *id.* at 540
(finding that "Georgia's interest in protecting a claimant from the possibility of an
unrecoverable judgment is not, within the context of the State's fault-oriented scheme, a
justification for denying the process due its citizens"); and *id.* at 542-43 (noting that there
are "several" methods that would comply with due process:  "Georgia may decide to
withhold suspension until adjudication of an action for damages brought by the injured
party.  Indeed, Georgia may elect to abandon its present scheme completely and pursue
one of the various alternatives in force in other States.  Finally, Georgia may reject all of
the above and devise an entirely new regulatory scheme." (footnote omitted)).

[37]     405 U.S. 645 (1972).

[38]     *Id.* at 649-50.

sought to declare a child to be a ward of the state due to allegations of neglect, only a "parent" could object. An unwed father, not legally a "parent," was "presumed at law" to be unfit, and was precluded from objecting to the state's attempt to take custody of his child.[39] For "parents," the law provided notice, a hearing, and proof of unfitness before the child could be removed. For non-"parents" (including unwed fathers) the law created an irrebuttable presumption of non-fitness, such that no hearing was required.[40]

The *Stanley* Court stressed that a father's interest in retaining custody of his child is a "cognizable and substantial" right subject to the dictates of equal protection.[41] And, the Court recognized, a state has a legitimate interest in protecting children from abuse. The Constitution, the Court explained, is not concerned with the legitimacy of legislative ends, but instead with "whether the means used to achieve these ends are constitutionally defensible."[42] The problem was that the state sought to achieve its ends without affording the unwed father a hearing to prove that he was a fit parent. The state had no interest in separating children from fit parents, yet its statute failed even to attempt to separate the fit from the unfit. The Illinois law simply presumed that all unwed fathers were unfit.

As it did in *Bell*, the *Stanley* Court considered the legislative policy underpinning the law. For instance, the Illinois law assumed that most unmarried fathers were neglectful. That may be true, the Court said; but it also may be true that some such fathers are "wholly suited to have custody of their children."[43] Under the Illinois law, every unwed father is denied the chance to prove his fitness. The Court acknowledged that, for

---

[39]     *Id.* at 650.

[40]     See id.

[41]     *Id.* at 652.

[42]     *Id.*

[43]     *Id.* at 654 (footnote omitted).

practical purposes, "prompt efficacious procedures" are a "state interest worthy of cognizance" and that "[p]rocedure by presumption is always cheaper and easier than individualized determination."[44]   But, the Court opined, the Constitution "recognizes higher values than speed and efficiency."[45]   Indeed, the Court emphasized, "one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones."[46]  The Court held that a law predicated upon an irrebuttable presumption—one which the impacted party has no opportunity to overcome—"needlessly risks running roughshod over the important interests" affected by the law.[47]  Due process requires at least a hearing at which a father can attempt to rebut the presumption upon which the law is based.  This right must prevail over any convenience that results from recourse to presumptions.

The Court continued its development of the irrebuttable presumption doctrine the next year in *Vlandis v. Kline*.[48]  Connecticut (like many or most states) allowed in-state residents who attend state-owned colleges and universities to pay less in tuition than non-residents.[49]  Connecticut law deemed unmarried students to be non-residents if their primary address was located outside Connecticut at any point in the year prior to admission.  By contrast, married students were classified as non-residents only if their

---

44      *Id.* at 656-57.

45      *Id.* at 656 (footnote omitted).

46      *Id.*

47      *Id.* at 657.

48      412 U.S. 441 (1973).

49      *Id.* at 442.

legal address was outside the state at the time of application to the school. These classifications were permanent and irrebuttable throughout the student's enrollment.[50]

The Court invalidated this statutory distinction. The Court acknowledged that most who apply to an institution of higher education from outside a state have no intention to be, and will never become, permanent residents of that state. However, the premise was not universally true. Not every out-of-state applicant fell within this category. Thus, relying upon *Bell* and *Stanley*, and summarizing the modern irrebuttable presumption doctrine, the Court held that it is "forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of non-residence, when that presumption is not necessarily or universally true, in fact, and when the State has reasonable alternative means of making the crucial determination."[51] Due process, the Court explained, "require[s] that the State allow such an individual the opportunity to present evidence" to rebut the presumption.[52]

Chief Justice Burger and Justice Rehnquist dissented. Chief Justice Burger accused the Court of applying strict scrutiny to the Connecticut statutory scheme, but without ever identifying how the law "impairs a genuine constitutional interest truly worthy of the standard of close judicial scrutiny."[53] To strike down the scheme, Chief Justice Burger asserted, the Court had to recast the "compelling state interest" prong of strict scrutiny into a search for a "permanent and irrebuttable presumption."[54] In his view, the Court sidestepped the correct inquiry in favor of applying a more "dubious" doctrine in

---

[50]      *Id.* at 443.

[51]      *Id.* at 452.

[52]      *Id.*

[53]      *Id.* at 460 (Burger, C.J., dissenting).

[54]      *Id.* (internal quotation marks omitted).

order to achieve a "just result in a particular case."[55]   Chief Justice Burger saw the irrebuttable presumption analysis as fundamentally flawed, because it had no discernible boundaries and likely exceeded the Court's authority.  "The real issue here is not whether holes can be picked in the Connecticut scheme; of course, that is readily done with this bad statute."[56]   Regardless of whether a law is enacted by a state legislature or by Congress, the Court "can find flaws, gaps, and hard and unseemly results at times.  But our function in constitutional adjudication is not to see whether there is some conceivably less restrictive alternative to the statutory classifications under review."[57]   Rather, the Court's task, as invoked in *Bell* and *Stanley*, is to identify essential, core constitutionally protected rights and then determine if the State is justified in infringing upon that right.  Applying the irrebuttable presumption doctrine instead of strict scrutiny, Chief Justice Burger feared, would put the Court in the untenable position of invalidating statutes based upon the Court's personal preferences concerning the wisdom of the particular statutory classification.   The Chief Justice suggested that, instead of attempting to implement "unrealistic" and "unexplained" standards, "when we examine a statute of a State we should lay aside preferences for or against what the State does in a few particular or isolated cases and look only to what the Constitution forbids a State to do, so as to avoid putting pressure on the States to engage in legislative devices to escape from the hobbles we place on them on matters of purely state concern."[58]

Justice Rehnquist would have found Connecticut's statutory solution to a complicated problem to be constitutional, despite the "rough edges around its

---

[55]     *Id.* at 459.

[56]     *Id.* at 460 (internal quotation marks omitted).

[57]     *Id.* (internal quotation marks omitted).

[58]     *Id.* at 463.

perimeter."[59]  The doctrine applied by the Court, Justice Rehnquist explained, was based upon a distorted notion of substantive due process—one in which courts substituted their "social and economic beliefs for the judgment of legislative bodies"—that "has long since been discarded."[60]  The Court should not be "concerned . . . with the wisdom, need, or appropriateness of the legislation."[61]

Despite the criticism levied by the dissenting Justices, the irrebuttable presumption doctrine lived on, and the Court continued to apply it.  Shortly after *Vlandis*, the Court used the doctrine to strike down public-school regulations that required pregnant teachers to take mandatory maternity leave without compensation five months before their expected delivery dates.  In that case, *Cleveland Bd. Of Educ. v. LaFleur*,[62] Justice Rehnquist again dissented, finding "no judicial standard of measurement" that would prohibit the line-drawing that occurred in the case.[63]  After all, the act of legislating "involves the drawing of lines, and the drawing of lines necessarily results in particular individuals who are disadvantaged by the line drawn being virtually indistinguishable for many purposes from those individuals who benefit from the legislative classification."[64]  Justice Rehnquist asserted that the Court's "disenchantment with irrebuttable presumptions," and its "preference for individualized determination," were "nothing less than an attack upon the very notion of lawmaking itself."[65]

---

[59]     *Id.* at 466 (Rehnquist, J., dissenting).

[60]     *Id.* at 468.

[61]     *Id.* (internal quotation marks omitted).

[62]     414 U.S. 632, 634-36, 651 (1974).

[63]     *Id.* at 660 (Rehnquist, J., dissenting).  Chief Justice Burger joined the dissent.

[64]     *Id.* (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483 (1955)).

[65]     *Id.* (quotation marks omitted).

Justice Powell concurred in the result but was "troubled" by the Court's invocation of the irrebuttable presumption doctrine, one that he had previously supported but now felt warranted reexamination.[66] He found merit in Justice Rehnquist's argument that the doctrine necessarily encroaches upon "the traditional legislative power to operate by classification."[67] "As a matter of logic, it is difficult to see the terminus of the road upon which the Court has embarked under the banner of irrebuttable presumptions."[68] In Justice Powell's view, the better avenue for challenges to legislative classifications lies under the Equal Protection Clause.

Then, in 1975, the irrebuttable presumption doctrine unraveled, as the views of the dissenting Justices emerged as the majority view. In an opinion authored by Justice Rehnquist in *Weinberger v. Salfi*,[69] the Court significantly circumscribed the doctrine. Before the *Salfi* Court was a social security eligibility provision that automatically deemed a marriage to be fraudulent if it had not been entered into at least nine months before death.[70] The lower court had concluded that the presumption of fraud was "conclusive, because applicants were not afforded an opportunity to disprove the [presumed] presence of [an] illicit purpose" behind the marriage,[71] and that the statute "presumed a fact which

---

[66] *Id.* at 652 (Powell, J., concurring) (citing his joinder in *Vlandis*).

[67] *Id.*

[68] *Id.* (internal quotation marks omitted).

[69] 422 U.S. 749 (1975).

[70] *See id.* at 753.

[71] *Id.* at 768.

was not necessarily or universally true."[72]  The Supreme Court held that the lower court erred in finding the provision unconstitutional upon these bases.[73]

The Court acknowledged that its prior cases, including *Stanley*, *Vlandis*, and *LeFleur*, "do not all sound precisely the same note" as the Court was now sounding.[74] Those prior cases, however, were distinguishable.  At issue was a statutory social welfare program of the type that the Court historically upheld so long as the statute did not "manifest a patently arbitrary classification, utterly lacking in rational justification."[75]  Such a social welfare provision will be deemed consistent with due process, even if it is predicated upon a conclusive presumption, provided that it is "rationally related to a legitimate legislative objective."[76]  Unlike the Court's earlier irrebuttable presumption doctrine cases, in which the interests impacted by the classifications garnered heightened constitutional protection, the welfare provision was "a noncontractual claim to receive funds from the public treasury," a claim that "enjoys no constitutionally protected status."[77] The Court warned that extending the irrebuttable presumption doctrine to social welfare statutes would "turn the doctrine of those cases into a virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with the Fifth and Fourteenth Amendments to the Constitution."[78]

---

[72]     *Id.*

[73]     *Id.*

[74]     *Id.*

[75]     *Id.* (internal quotation marks and citation omitted).

[76]     *Id.* at 772.

[77]     *Id.*

[78]     *Id.* at 773.

Although the *Salfi* Court did not expressly overrule the irrebuttable presumption precedents, that decision "severely hamper[ed] the applicability of the doctrine,"[79] and may well have become its obituary. In *Trafalet v. Thompson*, the United States Court of Appeals for the Seventh Circuit noted that, since *Salfi*, the Supreme Court has not invoked the doctrine in any other case, despite having the opportunity to do so.[80] The United States Court of Appeals for the Fifth Circuit thereafter referred to the doctrine as "a strange hybrid of procedural due process and equal protection invented by the Supreme Court in the early 1970s, and laid to rest soon after."[81] The effective abandonment persists to this day. The Supreme Court has never again invalidated a law on the basis of the irrebuttable presumption doctrine.

Instead, the Supreme Court has funneled challenges to statutory or regulatory classifications where they belong: under the Equal Protection Clause. In *Michael H. v. Gerald D.*,[82] for instance, Justice Scalia explained why such arguments do not arise from an inchoate notion of procedural due process, but instead from the Fourteenth Amendment's guarantee of equal protection of the law:

> This Court has struck down as illegitimate certain "irrebuttable presumptions." Those holdings did not, however, rest upon procedural due process. A conclusive presumption does, of course, foreclose the person against whom it is invoked from demonstrating, in a particularized proceeding, that applying the presumption to him will in fact not further the lawful governmental policy the presumption is designed to effectuate. But

---

[79]    Binnall, *supra* n.13, at 14; *see also DeLaurier v. San Diego Unified Sch. Dist.*, 588 F.2d 674, 683 n.16 (9th Cir. 1978) (noting that, although no court has expressly overruled the doctrine, "it is apparent that the use of that doctrine has been severely limited").

[80]    594 F.2d 623, 629 (7th Cir. 1979); *see also Schanuel v Anderson*, 708 F.2d 316, 319 (7th Cir. 1983) (declining to "revive" the doctrine after the Supreme Court effectively killed it in *Salfi*).

[81]    *Brennan v. Stewart*, 834 F.2d 1248, 1258 (5th Cir. 1988) (internal quotation marks omitted).

[82]    491 U.S. 110 (1989).

the same can be said of any legal rule that establishes general classifications, whether framed in terms of a presumption or not. In this respect there is no difference between a rule which says that the marital husband shall be irrebuttably presumed to be the father, and a rule which says that the adulterous natural father shall not be recognized as the legal father. Both rules deny someone in [that] situation a hearing on whether, in the particular circumstances of his case, [the state's] policies would best be served by giving him parental rights. Thus, as many commentators have observed, our "irrebuttable presumption" cases must ultimately be analyzed as calling into question not the adequacy of procedures but—like our cases involving classifications framed in other terms, the adequacy of the "fit" between the classification and the policy that the classification serves. We therefore reject [the father's] procedural due process challenge and proceed to his substantive claim.[83]

The Supreme Court has not been the doctrine's only critic. The doctrine has been widely panned by courts and scholars alike. The United States Court of Appeals for the Seventh Circuit called it "unworkable regardless of the interest which might have invoked it."[84] The United States Court of Appeals for the Second Circuit criticized it as a "potentially circular doctrine" that can be used to recharacterize every rebuttable presumption as an irrebuttable one "by redefining the relevant class."[85] The United States Court of Appeals for the Fifth Circuit decried the doctrine because it "forced the government to grant hearings to persons who claimed to have been wrongly trapped inside overinclusive classifications."[86] Along these lines, two prominent scholars criticized the foundation and application of the doctrine, as follows:

By masking substantive decisions in procedural language, the Supreme Court, in the irrebuttable presumption cases, confused due process and equal protection analysis. Irrebuttable presumption analysis allowed the Court to overturn legislative decisions without having to justify the use of judicial power as would an open use of substantive due process or equal

---

[83]     *Id.* at 120-21 (citations omitted).

[84]     *Schanuel*, 708 F.2d at 319.

[85]     *Catlin v. Sobol*, 93 F.3d 1112, 1118 (2d Cir. 1996).

[86]     *Brennan*, 834 F.2d at 1258.

protection analysis. The use of irrebuttable presumption language was a conceptually confused, if not dishonest, method of justifying independent judicial review of legislative classifications. The declining use of irrebuttable presumption analysis may evidence increasing willingness of justices to address directly the judicial role in reviewing legislatively created classifications.[87]

Another scholar characterized the Supreme Court's initial approach to irrebuttable presumption claims as "fundamentally misconceived,"[88] while yet another noted that federal courts have "uniformly abandoned" the doctrine in favor of assessing the validity of statutory classifications under an equal protection framework.[89]

The point is that, despite its auspicious start, the irrebuttable presumption doctrine has not endured. Instead, it has succumbed. The Supreme Court of the United States has abandoned it, and the federal judiciary refuses to apply it. Nonetheless, this Court— perhaps one of the last to do so—continues to apply the long-defunct doctrine. There is no good reason for persisting in this error.

As we have applied it, the current iteration of the irrebuttable presumption doctrine requires courts evaluating statutory classifications to assess first whether there is a constitutionally protected interest at stake that is burdened by an irrebuttable presumption. Then, the court must determine whether the premise underlying the classification—the presumption—is universally true. If it is not, the court must decide

---

[87]    3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law*, § 17.6 (5th ed. 2012); *see also* Deborah Dinner, *Recovering the LaFleur Doctrine*, 22 Yale J.L. & Feminism 343, 387-88 (2010) (describing irrebuttable presumption doctrine as widely criticized and no longer followed).

[88]    John M. Phillips, *Irrebuttable Presumptions: An Illusory Analysis*, 27 Stan. L. Rev. 449, 462 (1975).

[89]    Alan C. Green, Where Presumption Overshoots: The Foundation and Effects of Pennsylvania Department of Transportation v. Clayton, 116 Penn. St. L. Rev. 1181, 1182 (2012).

whether a reasonable alternative means exists for ascertaining the presumed fact.[90] Besides encroaching on the legislature's prerogative to make policy choices, the doctrine is, among its other defects, an illusory exercise, as courts are not equipped to analyze the questions that this test poses. No statutory classification is always going to be universally true. Thus, in cases like today's, courts are left to analyze "meaningful statistical measure[s]"[91] in a futile and misplaced effort to ascertain whether (or not) the policy decision rendered by the legislature supports the particular legislative presumption. In this case, the doctrine forces us to examine complicated statistical data generated by experts and decide whether there is a consensus in the field that would undermine the premise underlying the sexual offender law at issue. Second guessing the wisdom of legislation based on a judicial attempt at data-crunching is not in our wheelhouse. More importantly, it is not within our constitutional authority. Yet, this is the fool's errand upon which the irrebuttable presumption doctrine invites us to embark.

The doctrine is incomprehensible. It forces jurists to become pseudo-legislators. The test compels judges not to consider whether a recognized right is being burdened beyond permissible constitutional limits, but instead whether the statutory classification was a wise choice. At best, the doctrine compels courts to question the policy decisions of the legislative branch, and, at worst, to substitute the court's judgment for that of the legislature elected to make those policy decisions. As Justice Rehnquist opined in *Vlandis*, courts should not be "concerned . . . with the wisdom, need, or appropriateness of legislation."[92] Because it not only allows, but encourages, such second-guessing of policy, the irrebuttable presumption doctrine is "nothing less than an attack upon the very

---

[90]     *In re J.B.*, 107 A.3d 1, 15-16 (Pa. 2014).

[91]     Maj. Op. at 36.

[92]     *Vlandis*, 412 U.S. at 468 (Rehnquist, J., dissenting) (citation omitted in original).

notion of lawmaking itself."[93]  This is not to say that no avenue is available for challenges to statutory classifications that burden a protected right or that lack any rational basis.  As Justice Powell and Justice Scalia explained, that avenue is the Equal Protection Clause, not some amorphous doctrine derived vaguely from references to due process.[94]

Despite these criticisms, and despite the fact that both the United States Supreme Court (the doctrine's creator) and the rest of the federal judiciary have long since buried the doctrine, this Court stubbornly perpetuates it.  The Majority's justification for continuing to apply the doctrine is simply that we have done so in the past.[95]  Precedential inertia is no reason to apply a long abandoned and constitutionally indefensible doctrine.[96]  This path encourages parties to continue to raise non-viable claims, and it discourages them from seeking relief under the Equal Protection Clause, an approach that would be constitutionally sound and justiciable without treading upon the role of the legislative branch.  That this Court applied the irrebuttable presumption doctrine in *J.B.* is no justification either.  The right answer is not to perpetuate the error and prolong this misadventure, but rather to admit that the Court erred when it used the doctrine in *J.B.* as well, and then to move on.

---

[93]    *LaFleur*, 414 U.S. at 660 (Rehnquist, J., dissenting).

[94]    *See id.* at 652 (Powell, J., concurring); *Michael H.*, 491 U.S. at 120-21.

[95]    *See* Maj. Op. at 27.  The Majority also defends its application of the doctrine by noting that neither party challenges its validity in this appeal.  As noted above, this is no categorical impediment.  Here, as elsewhere, we are authorized to abrogate bad precedent and apply the correct decisional law.  *See supra* n.10.

[96]    This persistence in error is reminiscent, both jurisprudentially and methodologically, of this Court's odd and persisting obeisance to the long-disavowed *Lochner* doctrine and its unprincipled invocation of substantive due process.  *See Bert Co. v. Turk*, 298 A.3d 44, 86, 93-94 (Pa. 2023) (Wecht, J., concurring); *Yanakos v. UPMC*, 218 A.3d 1214, 1243 (Pa. 2019) (Wecht, J., dissenting); and *Shoul v. Com., Dept. of Trans.*, 173 A.3d 669, 690-93 (Pa. 2017) (Wecht, J., concurring).

The irrebuttable presumption doctrine is a jurisprudential corpse. For whatever reason, this Court insists on pretending it remains alive. The time has come to bury it.[97]

---

[97] It has been nearly one hundred years since the United States Court first stumbled into the irrebuttable presumption doctrine. By the latter half of the last century, federal courts had all but deserted it. It has been fifty years since the United States Supreme Court invalidated a statute under the doctrine. *See LaFleur*, 414 U.S. at 634-36. The doctrine's abandonment did not occur by happenstance or indifference. A fair reading of the Supreme Court's cases suggests that, due to its (at best) shaky tether to any federal constitutional provision, the doctrine was doomed from the get-go. "In fact, it is difficult to recall any doctrine utilized by the Court in the recent years which has been met with such a degree of antipathy as has the irrebuttable presumption/procedural due process analysis." *The Premature Demise of Irrebuttable Presumptions*, Jonathon B. Chase, 47 U. Colo. L. Rev. 653, 653 (1976). In the last five decades, federal courts have resisted resort to this "severely limited" doctrine, *DeLaurrier*, 588 F.2d at 683 n.16, have refused to "revive" this moribund doctrine, *Schanuel*, 708 F.2d at 319, or have pronounced the doctrine dead-on-arrival. *See Black v. Snow*, 272 F.Supp. 2d 21, 30-31 (D.D.C. 2003) (opining that "the doctrine has now been abandoned as a generally accepted approach" and has instead "simply collapsed into the ordinary equal protection/due process analysis") (cleaned up; internal quotations and citation omitted). The unavoidable fact is that the irrebuttable presumption doctrine, undeniably a creature of federal caselaw, has been wholly forsaken by the federal courts that invented it.

Notwithstanding the overwhelming, consistent evidence that the doctrine has fallen into desuetude in federal law, and despite general scholarly agreement to this effect, Justice Donohue's dissent insists that the doctrine remains full of vigor, alive and well. Justice Donohue cites no recent (or even not so recent) federal cases to support her belief that the doctrine endures. Instead, she criticizes my suggestion that we too should lay the doctrine to rest. She asserts that, despite the abundant proof of the doctrine's demise, my "punchline" "fails to land." Diss. Op. at 5-6 n.8. That the Supreme Court has not expressly overruled the doctrine does not mean that it is somehow flourishing in the federal law. Nor does the fact that Justice Scalia failed to explicitly "kill the irrebuttable presumption doctrine" in *Michael H. Id.* Fifty years of dormancy, overwhelming and extensive criticism, and the belief by most, if not all, federal courts that the doctrine has, in fact, been abandoned is all the evidence one needs.

All that the dissent can rely on is the peculiar circumstance that this Court—a state tribunal—continues to use the doctrine. That does not prove the doctrine's "longevity." Diss. Op. at 5-6 n.8. Rather, it speaks instead to the fact that this Court is lagging behind, or willfully ignoring, the federal courts' abandonment of their own doctrine. If our federal courts no longer apply a federal doctrine, this Court should question why we stubbornly persist in doing so. All of the available evidence strongly suggests that the irrebuttable presumption doctrine is no longer alive and well. This Court's blind (if sparse) use of the doctrine cannot and does not change that, and certainly does not breathe new life into a defunct idea.

Nonetheless, because the Majority ultimately denies relief on Torsilieri's irrebuttable presumption claim, I concur in the result on this issue.

## II. Analysis of Subchapter H Using the *Mendoza-Martinez* Factors

In *Muniz*, we held that SORNA I, when applied retroactively, was punitive in effect, and, thus, constituted an unconstitutional *ex post facto* law.[98] The General Assembly responded by enacting a new version of the regulatory scheme. This time, the General Assembly split the law in two. Subchapter I applies to those convicted sexual offenders whose crime occurred before December 20, 2012. Subchapter H applies to offenses that were committed after that date. In *Lacombe*, I explained that, in enacting Subchapter I, the General Assembly moved the needle "incrementally in a constitutional direction."[99] But the new law did not "go far enough to transform the punitive scheme into a regulatory one."[100] The law remained punitive in effect and, because it applied retroactively, should have been stricken as an unconstitutional *ex post facto* law.[101]

Subchapter H—the half of SORNA II that applies prospectively—does not differ significantly from Subchapter I. If anything, Subchapter H is, in effect, even more punitive than Subchapter I. Starting in *Lacombe*, and continuing today, the Majority misconstrues the nature of this regulatory scheme, and ignores the long-lasting punitive impact which that scheme imposes on a person's life. Because the Majority finds Subchapter H to be constitutional when it clearly is not, I respectfully dissent.

---

[98] *Muniz*, 164 A.3d at 1193 (OAJC).

[99] *Lacombe*, 234 A.3d at 629 (Wecht, J., concurring and dissenting).

[100] *Id.*

[101] *Id.*

Subchapter H applies to those convicted of a "sexually violent offense" that occurred on, or after, December 20, 2012,[102] and creates a statewide registry of those who are subject to the subchapter's many regulatory provisions.[103] A "sexual offender"[104]—a person who has been convicted of a Tier I, Tier II, or Tier III offense[105]— must register as such under Subchapter H for fifteen years (Tier I sexual offenders),[106] for twenty-five years (Tier II sexual offenders),[107] or for life (Tier III sexual offenders or "sexually violent predators"[108]).[109] A sexual offender must register immediately upon release from confinement in a correctional facility, or release from probation, parole, or a state intermediate punishment program.[110] Subchapter H requires every sexual offender to make a number of in-person appearances at certain approved locations throughout

---

[102]    42 Pa.C.S. § 9799.12 (defining "sexually violent offense" as one "specified in section 9799.14 (relating to sexual offenses and tier system) as a Tier I, Tier II or Tier III sexual offense committed on or after December 20, 2012, for which the individual was convicted.").

[103]    *Id.* § 9799.16(a).

[104]    *Id.* § 9799.12 (defining "sexual offender" as an "individual who has committed a sexually violent offense. The term includes a sexually violent predator.").

[105]    *Id.* § 9799.14(b)-(d) (categorizing "sexually violent offenses" into three tiers, Tier I, Tier II, and Tier III).

[106]    *Id.* § 9799.15(a)(1).

[107]    *Id.* § 9799.15(a)(2).

[108]    *See id.* § 9799.12 (defining "sexually violent predator" as an individual who has committed certain "sexually violent offenses" that "is determined to be a sexually violent predator under section 9799.24 (relating to assessments) due to a mental abnormality or personality disorder that makes the individual likely to engage in predatory sexually violent offenses.").

[109]    *Id.* § 9799.15(a)(3), (6).

[110]    *Id.* § 9799.15(b)(1)(i)(A)-(C).

each year. A Tier I sexual offender must appear in person one time per year,[111] while a Tier II sexual offender must report in person semiannually.[112] Tier III sexual offenders and "sexually violent predators" must register in-person four times per year.[113] However, if a Tier II or Tier III sexual offender complies with his or her registration obligations for a period of three years, and has not been convicted of any new crimes, he or she only needs to make one in person appearance per year. The remaining appearances may be made by telephone.[114] In addition to these personal appearances, a sexual offender is subject to other restrictions that require in-person compliance. For instance, a sexual offender must appear in person at least twenty-one days before traveling abroad, and must provide the Pennsylvania State Police with his or her departure and return dates, destination, and lodging arrangements.[115]

At the initial registration appearance, each offender must be photographed and fingerprinted,[116] and must "provide or verify" the following: (1) name, alias, nickname, pseudonym, or ethnic or tribal name; (2) any name or designation used for purposes of internet communications or postings; (3) telephone number; (4) social security number; (5) addresses for every residence (or intended residence) within, or outside, Pennsylvania, even if temporary, if the offender has an established home; (6) temporary habitat, abode, dwelling, homeless shelter, or park, if the sexual offender does not have an established home, as well as the places that such transient frequents to eat or engage

---

[111]   *Id.* § 9799.15(e)(1).

[112]   *Id.* § 9799.15(e)(2).

[113]   *Id.* §§ 9799.15(e)(3), (f)(2).

[114]   *Id.* § 9799.25(a.1)(1)-(2).

[115]   *Id.* § 9799.15(i).

[116]   *Id.* § 9799.39.

in leisure activities; (7) passport and documents establishing immigration status; (8) employment status, including the address for each place of employment; (9) the status of any professional license held; (10) the name and address for any institution at which the offender is a student; (11) information related to any motor vehicles owned or operated by the offender, including a description of such vehicle and its license plate number; (12) date of birth; and (13) proof of the offender's knowledge and understanding of his or her registration obligations.[117] At each subsequent in-person appearance, the sexual offender must verify that all of the above information is correct and up-to-date.[118] In addition to these annual obligations, a sexual offender also must appear in person within three business days to report a change, *inter alia*, to his or her name, address, employment status, student status, email address or instant messenger moniker, or professional licensing status.[119] A transient must make monthly appearances if he or she "adds or changes" where he or she camps, eats, or engages in leisure activities.[120] Registration is mandatory, and without exception. Not even a tornado or hurricane will excuse a sexual offender from his or her in-person registration requirements.[121]

Subchapter H also requires the Pennsylvania State Police to ensure that the electronic registry makes the following information public:

> (1) Physical description of the individual, including a general physical description and tattoos, scars and other identifying marks.

---

[117]   *Id*. § 9799.16(b).

[118]   *Id.* § 9799.15(d), (e).

[119]   *Id.* § 9799.15(g).

[120]   *Id.* § 9799.16(b)(6).

[121]   *Id.* § 9799.25(e).

(2) Text of the statute defining the criminal offense for which the individual is registered.

(3) Criminal history record information of the individual, including:

(i) Dates of arrests and convictions.

(ii) Status of probation, parole or supervised release.

(iii) Whether the individual is in compliance with requirements regarding this subchapter or has absconded.

(iv) Existence of any outstanding warrants.

(4) Current photograph of the individual. In order to fulfill the requirements of this paragraph, in addition to the taking of photographs pursuant to section 9799.15(e), the Pennsylvania State Police shall ensure that additional photographs are taken as needed when there is a significant change in appearance of the individual, including the taking of a current photograph before the individual is released from a State or county correctional institution or an institution or facility set forth in section 6352(a)(3) (relating to disposition of delinquent child) or discharged from the State-owned facility or unit set forth in Chapter 64 (relating to court-ordered involuntary treatment of certain sexually violent persons) due to:

(i) the expiration of sentence, period of commitment or involuntary treatment;

(ii) parole or other supervised release, including release to a community corrections center or a community contract facility;

(iii) commencement of a sentence of intermediate punishment; or

(iv) any other form of supervised release.

(5) Set of fingerprints and palm prints of the individual. In order to fulfill the requirements of this paragraph, the palm prints shall be taken for the purpose of submission to the Federal Bureau of Investigation Central Database. The palm prints shall be submitted for entry into the database.

(6) DNA sample of the individual. In order to fulfill the requirements of this paragraph, the sample shall be taken for the purpose of analysis and entry into the Combined DNA Index System (CODIS). In addition, the sample shall be analyzed and submitted for entry into CODIS.

(7) Photocopy of valid driver's license or identification card issued to the individual by the Commonwealth, another jurisdiction or a foreign country.[122]

The Pennsylvania State Police is tasked with managing all aspects of the registry, including its enforcement provisions.[123] Subchapter H also requires that the registry be maintained as a searchable electronic database,[124] which the Pennsylvania State Police must incorporate into a publicly accessible website.[125] That website must allow a user to obtain information about sexual offenders or "sexually violent predators" by searching for such individuals using various criteria.[126] The website also must allow the user to receive a notification when a sexual offender registers in accordance with the terms set forth above, or when a sexual offender moves into, or out of, a geographic area selected by the user.[127] When a user locates a sexual offender or sexual violent predator on the site, the user can obtain the following information about that offender:

(1) Name and aliases.

(2) Year of birth.

(3) Street address, municipality, county, State and zip code of residences and intended residences. In the case of an individual convicted of a sexually violent offense, a sexually violent predator or a sexually violent delinquent child who fails to establish a residence and is therefore a transient, the Internet website shall contain information about the transient's temporary habitat or other temporary place of abode or dwelling, including, but not limited to, a homeless shelter or park. In addition, the Internet

---

[122] *Id.* § 9799.16(c)(1)-(7).

[123] *Id.* §§ 9799.16(a), 9799.22.

[124] *Id.* § 9799.16(a)(1).

[125] *Id.* § 9799.28(a).

[126] *Id.* § 9799.28(a)(1)(i).

[127] *Id.* § 9799.28(a)(1)(ii).

website shall contain a list of places the transient eats, frequents and engages in leisure activities.

(4) Street address, municipality, county, State and zip code of any location at which an individual convicted of a sexually violent offense, a sexually violent predator or a sexually violent delinquent child is enrolled as a student.

(5) Street address, municipality, county, State and zip code of a fixed location where an individual convicted of a sexually violent offense, a sexually violent predator or a sexually violent delinquent child is employed. If an individual convicted of a sexually violent offense, a sexually violent predator or a sexually violent delinquent child is not employed at a fixed address, the information shall include general areas of work.

(6) Current facial photograph of an individual convicted of a sexually violent offense, a sexually violent predator or a sexually violent delinquent child. This paragraph requires, if available, the last eight facial photographs taken of the individual and the date each photograph was entered into the registry.

(7) Physical description of an individual convicted of a sexually violent offense, a sexually violent predator or a sexually violent delinquent child.

(8) License plate number and a description of a vehicle owned or operated by an individual convicted of a sexually violent offense, a sexually violent predator or a sexually violent delinquent child.

(9) Offense for which an individual convicted of a sexually violent offense, a sexually violent predator or a sexually violent delinquent child is registered under this subchapter and other sexually violent offenses for which the individual was convicted.

(10) A statement whether an individual convicted of a sexually violent offense, a sexually violent predator or a sexually violent delinquent child is in compliance with registration.

(11) A statement whether the victim is a minor.

(12) Date on which the individual convicted of a sexually violent offense, a sexually violent predator or a sexually violent delinquent child is made active within the registry and date when the individual most recently updated registration information.

(13) Indication as to whether the individual is a sexually violent predator, sexually violent delinquent child or convicted of a Tier I, Tier II or Tier III sexual offense.

(14) If applicable, indication that an individual convicted of a sexually violent offense, a sexually violent predator or a sexually violent delinquent child is incarcerated or committed or is a transient.[128]

The user cannot obtain any information about the victim of the offender's crimes, the offender's social security number, any information pertaining to arrests that did not result in convictions, or any travel or immigration documentation.[129] The site provides instructions, as well as a warning stating that the website should not be used to harass, intimidate, or embarrass anyone.[130]

There is a mechanism by which a Tier III "sexual offender," such as Torsilieri, or a sexual violent predator can be excused from the demands of Subchapter H, but such offender may not petition for such relief until a quarter century has passed. Specifically, such an offender may request that a court remove him or her after twenty-five years of being listed on the registry, if, during that period, the individual has not been convicted of a crime for which the penalty exceeds one year.[131] Upon such a petition, the Sexual Offenders Assessment Board must review the individual's petition and determine whether he or she poses a threat to another person.[132] If not, the trial court may, in its discretion and after an evidentiary hearing, exempt the offender from any or all of Subchapter H's requirements, if the court is satisfied by clear and convincing evidence that doing so would not endanger any other person.[133]

---

[128] *Id.* § 9799.28(b)(1)-(14).

[129] *Id.* § 9799.28(c)(1)-(4).

[130] *Id.* § 9799.28(a)(2).

[131] *Id.* § 9799.15(a.2)(1).

[132] *Id.* § 9799.15(a.2)(2).

[133] *Id.* § 9799.15(a.2)(5).

The consequence of failing to comply with any of Subchapter H's commands is severe. If a sexual offender fails to register as detailed above, verify the information as ordered, be photographed at each in-person appearance, or provide accurate information at all times, that individual will be charged with a new and separate criminal offense.[134] That crime, entitled "Failure to comply with registration requirements," is a felony.[135] This is not Subchapter H's only cross-over into the criminal process. If an offender is on probation and parole, Subchapter H authorizes a parole or probation agent to track the sexual offender using global positioning technology.[136]

Subchapter H creates a comprehensive statutory scheme that imposes significant burdens upon a sexual offender for a lengthy period of time. For some, like Torsilieri, those burdens remain for the remainder of the offender's life. And the law's insistence on compliance is unyielding: one misstep is a felony. It is not my role to opine "in any way upon the propriety or wisdom of the obligations imposed upon sexual offenders."[137] My task is to determine whether the scheme, as enacted, is punitive in its effect. For the reasons that follow, it is.

### A. Legislative Intent

The determination of whether a regulatory or statutory scheme is punitive entails a two-part inquiry. A reviewing court first must decide whether the legislature intended to levy a punishment. If so, the analysis ends. If, on the other hand, the legislature intended to enact a non-punitive scheme, then the court proceeds to the second prong of the

---

[134] *Id.* § 9799.21(a)(1)-(3).

[135] *See* 18 Pa.C.S. § 4915.1. Grading depends upon a number of factors, and ranges from a third-degree felony to a first-degree felony. *See id.*

[136] 42 Pa.C.S. § 9799.30.

[137] *Lacombe*, 234 A.3d at 657 (Wecht, J., concurring and dissenting).

inquiry, and must determine whether the law is "so punitive either in purpose or effect as to negate [the state's] intention to deem it civil."[138]

For the initial inquiry, the only question is "whether the General Assembly's intent was to punish."[139] As with Subchapter I, the General Assembly did not intend to impose a punitive scheme when it enacted Subchapter H. The General Assembly expressly instructed courts that Subchapter H "shall not be construed as punitive."[140] The legislature declared that the purpose of Subchapter H was not to punish, but rather to "further protect the safety and general welfare of the citizens of this Commonwealth by providing for increased regulation of sexual offenders, specifically as that regulation relates to registration of sexual offenders and community notification about sexual offenders."[141] It is undeniable that the General Assembly intended to enact a civil regulatory scheme.

## B. The *Mendoza-Martinez* Factors

That the legislature disclaimed any intent to create a punitive statutory scheme only resolves the first prong of the inquiry at hand. The court still must determine whether the scheme is punitive in effect, legislative intent notwithstanding. In *Mendoza-Martinez*, the United States Supreme Court identified seven factors for use in assisting courts to determine whether a particular statutory scheme is, in effect, punitive.[142] Those factors are as follows:

---

[138] See *Smith v. Doe*, 538 U.S. 84, 92 (2003) (internal quotation marks and citations omitted).

[139] *Muniz*, 164 A.3d at 1209 (OAJC) (quoting *Williams II*, 832 A.2d at 971).

[140] 42 Pa.C.S. § 9799.11(b)(2).

[141] *Id.* § 9799.11(b)(1).

[142] *Mendoza-Martinez*, 372 U.S. at 168-69.

> [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned.[143]

I take up each of these factors in turn.

### i. Whether Subchapter H Imposes an Affirmative Disability or Restraint

In *Muniz*, wherein this Court invalidated the initial version of SORNA, the OAJC determined that this factor weighed in favor of deeming SORNA I punitive. In the main, this was due to the impact that the in-person registration requirements had on the offender's life. The *Muniz* OAJC specifically noted that, extrapolated over a twenty-five year period, a Tier III offender would have to make at least one hundred in-person appearances, constituting a significant restraint upon a person's life.[144] Following *Muniz*, the General Assembly reduced the number of in-person visits. In *Lacombe*, this reduction meant that an offender was required to make twenty-five in-person visits over a twenty-five year period, instead of the one hundred deemed punitive in effect in *Muniz*. Apparently, for the *Lacombe* Majority, there was a point at which a requirement for in-person visits comes to constitute an affirmative disability or restraint. We still do not know where that line is. All we know is that, for the *Lacombe* Majority, a requirement of one hundred such visits fell on one side of that line, while a twenty-five visit rule fell on the other.[145]

---

[143]    *Id.* (footnotes omitted).

[144]    *Muniz*, 164 A.3d at 1210 (OAJC).

[145]    *Lacombe*, 234 A.3d at 619-20.

Today's Majority makes the same error as it made in *Lacombe*. At a minimum, for Tier III offenders, Subchapter H requires thirty-four in-person visits over a twenty-five year period.[146] Apparently, thirty-four falls on the non-punitive side of this Court's invisible line. Like the *Lacombe* Majority, today's Majority declines to reveal where that line is, or how to find it. We simply must take the Majority's word for the proposition that thirty-four does not rise above its hidden line in the sand.

Rather than treat this factor as some unnecessary and arbitrary counting exercise, we should recognize that "the simple legislative command to appear and report in person to the PSP suffices to establish a disability or restraint."[147] The question is not "how much" does the law restrain or disable a person's freedom. The question is "does it do so?" The answer is yes. As I explained in *Lacombe*, the "sheer *number* of appearances" is not the "defining criterion" for this factor.[148] "The disability or restraint is the obligation to remove oneself from one's daily life and to report to the governmental authority. A law that requires a person to take such action necessarily imposes a disability or restraint upon the person."[149] The frequency of the in-person visits is only relevant to the final balancing of all of the factors. It is not determinative of whether the statute imposes a disability or restraint in the first instance.

Even if the factor could be resolved by merely counting the in-person visits, the Majority does not account for the additional reporting requirement that compels a Tier III offender like Torsilieri to appear in person within three days each time he changes his

---

[146] *See* Maj. Op. at 45.

[147] *Lacombe*, 234 A.3d at 648 (Wecht, J., concurring and dissenting).

[148] *Lacombe*, 234 A.2d at 646-47 (Wecht, J., concurring and dissenting) (emphasis in original).

[149] *Id.* at 647.

name, address, employment status, etc.[150]  Minor changes such as adding a digit to an email address or changing one's preferred name from "Bob" to "Bobby" necessitate an in-person visit.  These mandatory in-person updates can add numerous in-person visits to one's yearly obligation.  The Majority ignores these in-person visits entirely, and chooses not to explain why they are not included in its tally.  This is particularly troublesome here, where the Majority operates using an unknown and unknowable line.  Since we do not know where the line is, we cannot know whether any additional in-person update visits would push the total over that line.  The Majority's method for reviewing this factor is not an accurate tool for measuring its punitive effect.

The Majority also finds that the punitive nature of Subchapter H is lessened by the removal provision.  The Majority does not explain how a mechanism allowing a person to *seek*, but not necessarily obtain, removal from the statutory obligations after twenty-five years of compliance means that the offender was not subjected to an affirmative disability or restraint during the twenty-five years of compliance.  Presumably, the Majority would not say that a person imprisoned for twenty-five years was not subjected to an affirmative restraint during that time simply because he eventually was released.  Yet, that is how the Majority interprets the effect of the removal provision.  Regardless, as I stated in *Lacombe*, little weight should be afforded to this device:

> [T]he mechanism provides only an opportunity to seek relief; such relief is far from a guarantee.  The petitioner must make a compelling showing—indeed, by clear and convincing evidence—that, after a lengthy period of time, he or she is not likely to pose a threat to anyone.  In this regard, the trial court still retains discretion to deny the petition.  Additionally, the requirement is not limited to the threat that the offender will commit additional sexual offenses, nor is the potential threat limited to his or her original victim or to a similar person or age group.  The court can exercise its discretion to deny the petition if it concludes that the offender may pose any threat to any person, in any circumstances, even if entirely unrelated to

---

[150]     *See* 42 Pa.C.S. § 9799.15(g).

the goals articulated by the General Assembly in enacting this statutory scheme. I do not find the mechanism to be illusory . . . but I nonetheless am unable to ignore the high bar that it sets. The standard of proof, the court's discretion, and the broad showing of non-dangerousness required of the offender—the proof of a negative—make achieving relief exceedingly difficult. . . .[151]

Like Subchapter I, Subchapter H imposes "the obligation to remove oneself from one's daily life and to report to the governmental authority."[152] It imposes an affirmative disability or restraint, and accordingly weighs in favor of it being punitive.

### ii. Whether the Operation of Subchapter H is Consistent With What Historically Has Been Regarded as Punishment

As this Court has repeatedly held,[153] and as today's Majority holds,[154] Subchapter H is "akin to probation,"[155] and this factor clearly weighs in favor of finding the statute to be punitive. Our prior analyses of this factor largely are predicated upon a concurring opinion that then-Judge (now Justice) Donohue wrote in *Commonwealth v. Perez*,[156] wherein she examined the parallels between the conditions imposed upon a sexual offender by Subchapter H and those imposed upon a probationer.[157] As Justice Donohue explained, the in-person visits required of sexual offenders are no different than a probationer's regular visits with his or her probation officer. Like probation and parole, Subchapter H requires that sexual offenders inform the authorities of any changes in

---

[151] *Lacombe*, 234 A.3d at 656 (Wecht, J., concurring and dissenting) (internal quotation marks omitted).

[152] *Id.* at 647.

[153] *Muniz*, 164 A.3d at 1213 (OAJC); *Lacombe*, 234 A.3d at 623.

[154] Maj. Op. at 47.

[155] *Muniz*, 164 A.3d at 1213 (OAJC).

[156] 97 A.3d 747 (Pa. Super. 2014) (Donohue, J., concurring).

[157] *Id.* at 763-64.

residency and employment, imposes limits on travel and movement, and imposes punishment for non-compliance.

As I outlined in *Lacombe*, there are some differences as well. When a probationer violates the conditions of probation, he or she can only be sentenced to the penalty that the trial court could have imposed in the first instance. A parolee who fails to comply with the conditions of release will be remanded to prison to serve the remainder of his or her original sentence.[158] A sexual offender who violates the terms of Subchapter H, on the other hand, will be charged with a felony, which "could result in a penalty much more severe than that attendant to a violation of probation."[159] And, unlike probation, the term of which cannot exceed the statutory maximum of the crime, a sexual offender like Torsilieri must comply with Subchapter H for the rest of his life. "Because the ultimate objective presently is to ascertain whether Subchapter [H] is punitive, the fact that the requirements of Subchapter [H] not only closely resemble probation but actually expose the offender to additional, and in many instances more severe, criminal punishment weighs heavily in favor of a finding of punitiveness."[160]

Subchapter H brings to mind some forms of colonial shaming. As detailed above, Subchapter H requires the Pennsylvania State Police to create and maintain a website. Anyone with internet access—which, by now, is nearly every person in the United States of America, twenty-four hours a day—can readily access that website, see the offender's photograph, and learn where the offender lives, the nature of his crime, his license plate number, etc.[161] "With a few quick clicks, nearly anyone can access the sexual offender

---

[158] *See* 42 Pa.C.S. § 9754(a) (providing that a term of probation "may not exceed the maximum term for which the defendant could be confined.").

[159] *Lacombe*, 234 A.3d at 649 (Wecht, J., concurring and dissenting).

[160] *Id.* at 650.

[161] 42 Pa.C.S. § 9799.28(b)(1)-(14).

website and obtain no fewer than fourteen different pieces of personal or identifying information on any offender."[162]  An interested member of the public does not even need to sit down at the computer and search for this information.  The website automatically will send information to any interested person any time a sexual offender moves into or out of an area.[163]  It is difficult to distinguish the exposure of photographs and personal information, all framed within the context of a sexually-related crime, on a publicly available website, from colonial face-to-face shaming punishments.  What I said in *Lacombe* still holds true:  the "avenues available for harassment and ostracism of [] offenders that most commonly are associated with public shaming are ever-present and immediately available in a substantial majority of American homes."[164]

This factor weighs in favor of finding the statute to be punitive.

### iii.    Whether the Statute Comes into Play Only on a Finding of *Scienter*

As was true in *Muniz* and *Lacombe*, "this factor is of little significance in our inquiry."[165]  As we explained in *Muniz*, because it is clear that sexual offender statutes are aimed at protecting the public from recidivism, "past criminal conduct is 'a necessary beginning point.'"[166]

### iv.    Whether Subchapter H's Operation Will Promote the Traditional Aims of Punishment—Deterrence and Retribution

---

[162]    *Lacombe*, 234 A.3d at 649 (Wecht, J., concurring and dissenting).

[163]    42 Pa.C.S. § 9799.28(a)(1)(ii).

[164]    *Lacombe*, 234 A.3d at 648-49 (Wecht, J., concurring and dissenting).

[165]    *Muniz*, 164 A.3d at 1214 (OAJC); *Lacombe*, 234 A.3d at 623.

[166]    *Muniz*, 164 A.3d at 1214 (OAJC) (quoting *Smith*, 538 U.S. at 105).

In *Lacombe*, the Majority held that, while Subchapter I promoted traditional notions of retribution, it did not promote any type of deterrence, because Subchapter I applied retroactively, not prospectively.[167] Today's Majority finds that Subchapter H—which, unlike Subchapter I, applies prospectively—promotes both of these traditional aims of punishment. The Majority nonetheless "question[s] the strength of the [deterrent] effect of registration requirements compared to the criminal conviction and sentence for the underlying sex offense."[168] I agree that the statutory scheme advances both retribution and deterrence. However, I disagree with the insignificance that the Majority attributes to the deterrent effect.

That such statutory schemes promote retribution is now well-established. Like SORNA I and Subchapter I, Subchapter H is triggered upon a criminal conviction, mandates a significant number of in-person visits to the Pennsylvania State Police, requires registration for at least fifteen years and in many cases as long as one's lifetime, and directs that extensive personal and identifying information be posted on the internet for public consumption. There is no reason to deviate from our previous decisions which held that these statutory imperatives are retributive in nature.

Subchapter H also has a significant deterrent effect. The Majority does not elaborate on why it "question[s] the strength of the [deterrent] effect" of Subchapter H. The Majority's minimization of the deterrent aspect of this factor contrasts starkly with this Court's statement in *Muniz* that "the prospect of being labeled a sex offender accompanied by registration requirements and the public dissemination of an offender's personal information over the internet has a deterrent effect."[169] Moreover, in

---

[167] *Lacombe*, 234 A.3d at 624.

[168] Maj. Op. at 49.

[169] *Muniz*, 164 A.3d at 1215 (OAJC).

downplaying the subchapter's deterrent effect, the Majority's position ignores "the General Assembly's obvious desire to deter offenders from flouting the terms and obligations imposed upon them, a failure which would constitute a new criminal offense, a patent indicator of deterrent effect."[170]  Subchapter H's lengthy periods of registration require vigilant compliance with numerous, onerous obligations and limitations.  A single failure results in the registrant being charged, convicted, and sentenced for at least a third-degree felony, and possibly a first-degree felony.  In many cases, the offense and punishment for failing to comply with Subchapter H is more severe than the crime that subjected the offender to its terms in the first place.  Subchapter H's requirements, including up to a lifetime of registration and being labeled a sexual offender on a publicly-accessible website, along with the prospect of a first-degree felony conviction and sentence, have a strong deterrent effect on future criminal behavior.  There is nothing "questionable" about it.

### v.      Whether the Behavior to Which Subchapter H Applies Already is a Crime

As with the third factor, and consistent with *Muniz*, this factor "carries little weight in the balance."[171]

### vi.     Whether an Alternative Purpose to Which Subchapter H May Rationally Be Connected is Assignable for It

This factor weighs in favor of finding the statutory scheme to be non-punitive.  In Subchapter H, the General Assembly declared that its purpose was not to punish, but "to further protect the safety and general welfare of the citizens of this Commonwealth by providing for increased regulation of sexual offenders, specifically as that regulation

---

[170]    *Lacombe*, 234 A.3d at 651 (Wecht, J., concurring and dissenting).

[171]    *Muniz*, 164 A.3d at 1216 (OAJC).

relates to registration of sexual offenders and community notification about sexual offenders."[172]  The General Assembly also enacted the subchapter in order to facilitate the "exchange of relevant information about sexual offenders among public agencies and officials and to authorize the release of necessary and relevant information about sexual offenders to members of the general public as a means of assuring public protection."[173] These policy-based judgments plainly serve "a purpose other than punishment to which the statute reasonably can be connected:  to protect and inform the public regarding dangers ascertained by the General Assembly."[174]

### vii.   Whether Subchapter H Appears Excessive in Relation to the Alternative Purpose Assigned

The final factor requires consideration of whether the effect of the statutory scheme is excessive in relation to its non-punitive purpose.  In *Lacombe*, I explained why Subchapter I was excessive when compared to the goals of the legislation:

> Subchapter I still governs an array of offenses, ranging from misdemeanors to first-degree felonies.  Once an offender is subject to the subchapter's governance, the obligations and impact upon him or her are onerous and undeniable.  For a [sexual offender], [at least one] annual in-person report to the PSP is required for completion of registration paperwork and for photography.  The offender promptly must report changes to the same authorities, and extensive information is posted online concerning the offender's likeness, vehicle, residence, etc. The threat of a separate felony prosecution (accompanied by likely imprisonment) for failure to comply looms over the offender for the duration of his or her registration period, and possibly for a lifetime.  The duration of the obligations ranges from ten years to a lifetime, and, as I explained above, can exceed the punishments meted out for the actual crime that the offender committed.  All told, Subchapter I creates a formidable web of restraints and obligations, erects hurdles in an

---

[172]   42 Pa.C.S. § 9799.11(b)(1).

[173]   *Id.* § 9799.11(b)(2).

[174]   *Lacombe*, 234 A.3d at 653 (Wecht, J., concurring and dissenting).

offender's path to seeking and holding gainful employment, and exposes the offender to harassment and ostracism.

I do not for a moment disregard or demean the General Assembly's non-punitive goals. Nonetheless, this close call must fall in favor of finding the statutory scheme to be excessive. The entirety of the subchapter's obligations functionally dominate the offender's existence, and surpass that which is necessary to achieve the non-punitive legislative aims.[175]

The core components and long-term burdens of Subchapter H are the same, if not more onerous, than Subchapter I. Thus, I am compelled to reach the same conclusion that I reached in *Lacombe.* Subsection H goes further than is necessary to achieve its legislative goals.

The Majority reaches the opposite conclusion, in no small part because of the statute's removal mechanism.[176] I addressed the effect of this provision on the excessiveness inquiry in *Lacombe.* While the removal route may offer a "meaningful device for courts and offenders,"[177] it cannot be considered standing alone. For purposes of this factor, we are required to consider the "entire statutory scheme,"[178] not just one facet of it. Viewed accordingly, it is clear that the mechanism does not carry the vast impact that the Majority assigns to it. It does not even apply to all sexual offenders. The removal mechanism is available only after twenty-five years of continuous and unbroken compliance.[179] Some offenders only must comply with Subchapter H for fifteen years.[180] The removal mechanism is unavailable to those offenders. The mechanism hardly can

---

[175]    *Id.* at 654.

[176]    *See* Maj. Op. at 53.

[177]    *Lacombe*, 234 A.3d at 655 (Wecht, J., concurring and dissenting).

[178]    *Muniz*, 164 A.3d at 1218 (OAJC).

[179]    *See* 42 Pa.C.S. § 9799.15(a.2).

[180]    *Id.* § 9799.15(a)(1).

be said to mitigate the statute's excessiveness when it does not even apply to all those subject to its terms and conditions.

Moreover, the mechanism provides no guarantee of removal. It offers but a chance to ask to be removed. And that opportunity becomes available only after twenty-five years of perfect compliance and proof by clear and convincing evidence that the offender no longer poses a risk to anyone. Even then, a court may "exercise its discretion to deny the petition if it concludes that the offender may pose any threat to any person, in any circumstances, even if entirely unrelated to the goals articulated by the General Assembly in enacting this statutory scheme."[181] "The standard of proof, the court's discretion, and the broad showing of non-dangerousness required of the offender—the proof of a negative—make achieving relief exceedingly difficult, such that the mere potential for such relief does not mitigate the other aspects of Subchapter [H] that are excessive."[182]

This factor also weighs in favor of a finding that Subchapter H is punitive.

### viii.    Balancing of the Factors; Conclusion

The Majority correctly notes that the *Mendoza-Martinez* factors are "guideposts" that are neither "exhaustive nor dispositive."[183] This final examination is "not a linear or formulaic exercise."[184] Nor is it a "mere mathematical comparison of how many factors

---

[181]    *Lacombe*, 234 A.3d at 656 (Wecht, J., concurring and dissenting).

[182]    *Id.*

[183]    Maj. Op. at 54 (quoting *Smith*, 538 U.S. at 97).

[184]    *Lacombe*, 234 A.3d at 656 (Wecht, J., concurring and dissenting).

fall on each side of the equation."[185] The "assessment of the factors must be flexible in order to account for the particular constitutional challenge asserted."[186]

The Majority decides that only two of the five factors that it considered weigh in favor of finding the statute punitive in effect. In one of those two factors, the consideration of the traditional aims of punishment, the Majority significantly undervalues Subchapter H's deterrent effect. The Majority concludes that the other three factors militate in favor of finding Subchapter H non-punitive.

My analysis differs. As shown above, four of the five relevant factors weigh in favor of finding that the statutory scheme is punitive in effect. Moreover, unlike the Majority, I find the statute's deterrent effect to be a significant consideration in the overall assessment. Overall, Subchapter H: (1) imposes affirmative disabilities or restraints upon the "sexual offenders;" (2) resembles sanctions that historically have been considered punishment; (3) promotes the traditional punitive goals of deterrence and retribution; and (4) is excessive in relation to its stated purpose. Combined, these factors "paint a clear picture of punitive effect."[187] As I explained in *Lacombe*:

> The impact that subjection to Subchapter I will have on an offender's life cannot be [overstated]. Compliance with the subchapter will be the defining feature of an offender's life for the duration of his or her statutory obligations, be it ten years or a lifetime. The offender must report yearly to an approved facility, differing little if at all from a probationer's visit with a probation officer. The offender is required to report to the PSP within three days any changes in the essential aspects of his or her existence. Although this obligation is less demanding than the more numerous in-person reporting requirements of earlier statutes, it nonetheless impacts the offender's life heavily, inasmuch as it creates a perpetual obligation that can never be neglected, lest severe penalties be inflicted for a single failure. At the same time, a significant amount of an offender's identifying information is posted

---

[185] *Id.*

[186] *Id.*

[187] *Id.* at 657.

online, and can be accessed readily or even automatically delivered to members of the public. This may impair an offender's ability to move into a community, to attend school, to find and keep gainful employment, and to remain crime-free without the threat of harassment or ostracism. Such control and monitoring differs little, if at all, from the situation of a convicted offender placed on probation. Indeed, as I explained above, it can result in penalties for non-compliance more severe than those a probationer would face for violating the terms and conditions of his or her sentence.

All told, the statutory enactment restrains the offender's liberty, resembles punishment, and is aimed at deterrence and retribution, resulting in a scheme that is excessive in relation to the lone factor weighing in the opposite direction, the existence of a rationally connected non-punitive purpose. I would deem this to be the "clearest proof" that is necessary to render the civil scheme punitive in effect.[188]

This holds true for the impact of Subchapter H as well. For all of these reasons, I would find that Subchapter H is punitive in effect. For a lifetime registrant like Torsilieri, Subchapter H imposes a mandatory punishment that far exceeds the statutory maximum for his offenses, in violation of *Apprendi v. New Jersey*.[189] Consequently, Subchapter H is unconstitutional. Because the Majority finds otherwise, I respectfully dissent.

---

[188] *Id. See Hudson v. United States*, 522 U.S. 93, 100 (1997) (noting that only the "clearest proof" will suffice to prove that a civil regulatory scheme is punitive in its effect).

[189] 530 U.S. 466, 490 (2000).